JOHN F. HAMAKER, Plaintiff in Error, *v.* SUSANNA HAMAKER, Defendant in Error.

### ERROR TO CASS.

The court will not allow divorces under the eighth section of the act in relation to that subject, except for such causes as are named in the act, and as were sufficient under the canon and common law.

Occasional paroxysms of hereditary insanity, before marriage, unknown to the husband, do not furnish a ground for divorce. Nor does complete insanity after marriage.

THE bill shows that complainant is a resident of Cass county, Illinois, and had resided there more than one year next before the filing of the bill; that the parties intermarried on the 13th of January, 1853; that the respondent is incurably insane, and was insane at the date of the marriage. That shortly after the marriage, respondent exhibited symptoms of insanity, which soon became settled and confirmed insanity, its manifestations being absent mindedness, and causeless and violent paroxysms of anger and other passions; that for three years next before the marriage, respondent had exhibited manifestations of insanity similar to those now manifested in her state of confirmed insanity, and that this insanity of respondent was unknown to the complainant until after the marriage. Complainant prays a divorce.

At the November term, 1855, process having been duly served, a conservator *ad litem* was appointed by the court, who answered, denying all the allegations of the complainant's bill, and the case was then referred to the master, who reported the proofs :

Elias Valentine deposes that complainant has resided, for the last nine years, in Cass county, Illinois.

Master reports that the records of the Cass County Court show that complainant and respondent intermarried on the 13th of January, 1853.

Maria M. Fox deposes, that she has known respondent from a period shortly after her marriage, and thinks she has been insane at times ever since. Her insanity has manifested itself in violent and causeless anger, especially directed toward her husband. Respondent frequently threatened the life of her husband. Respondent's mother has long been insane, and the manifestations of her insanity were like those exhibited by respondent.

John H. Fox testified to the same facts set forth in the deposition of Maria M. Fox.

Margaret Ream deposed that she lived in the family of complainant. Every effort was made by complainant, and others of the family, to please the respondent, but she was almost continually in a rage, and frequently threatened to take the life of complainant and of witness. Respondent twice hid a butcher knife about the bed of complainant, with the purpose, as respondent avowed, after the knife had been discovered, of taking complainant's life. Respondent once attempted to kill witness, inflicting a severe wound with a butcher knife.

John Pfeil testifies that the house of complainant was burned, and that respondent afterward admitted that she purposely set the fire, stating how it was done; and that the circumstances attending the fire confirmed the truth of her admission. During a sickness of complainant, which was protracted and severe, respondent so neglected him that his father was under the necessity of taking complainant to his own house.

Adam Price testifies that respondent, for three years before her marriage, lived in the family of witness, and, during those three years, respondent frequently exhibited strong passion, waywardness and singularity, so marked as to elicit the remark of witness at the time, that respondent would be insane, like her mother, who was then in a confirmed state of insanity.

Respondent so conducted toward the children of witness, that fears were entertained that she would kill them. When in a passion, respondent would clench her hands, gnash her teeth, and show great rage without cause; was absent minded, and, without any known cause, would sigh and moan as if in

great distress. Her general appearance was that of a person of deranged mind. She absented herself frequently, for days, without notice and without explanation. Thinks complainant did not know anything of respondent's insanity before marriage, as he had but little opportunity of seeing her.

Susan Price states the same facts testified to by Adam Price, with the additional statement, that witness frequently feared that respondent would take her life, and that she lived in dread of respondent.

Andrew McFarlan states that he is superintendent of the state hospital for the insane; that respondent is in charge of deponent as a patient, and is probably incurably insane. Her manifestations of insanity are the usual symptoms of *dementia.* Upon the basis of her present condition, and assuming the testimony of the witness as to her conduct before marriage to be true, witness is of opinion that there is strong evidence of the insanity of respondent, previous to her marriage, in January, A. D. 1853.

V. A. Turpin is a practicing physician, and an expert in cases of insanity. Heard the testimony of witness, herein before set forth, and is satisfied that respondent was insane before her marriage, and is now incurably insane.

R. B. Conn is a practicing physician. Has heard the testimony of the witness in this case, and is of the opinion that respondent was insane before her marriage, and is now incurably insane.

A trial was had at the November term, 1856, when a decree was rendered, dismissing the bill, at complainant's costs, without prejudice.

To reverse this decree, and obtain a decree for divorce, this writ of error is sued out.

J. Grimshaw and H. E. Dummer, for Plaintiff in Error.

N. M. Knapp, for Conservator.

Scates, C. J. The grounds presented in the bill for a divorce are, insanity at the time of making the marriage contract and the marriage, and confirmed and incurable insanity since.

Notwithstanding the eighth section of the act in relation to divorces has conferred a discretionary power upon the courts, if literally understood, yet the court has not so construed it, but confines itself to the common, or canon law and statutory causes. Rev. Stat. 1845, p. 197, Sec. 8; *Birkby* v. *Birkby et al.*, 15 Ill. R. 120; *Vignos* v. *Vignos*, id. 186; *Harman* v. *Harman*, 16 ibid. 85. The largest extent of that section

would be to include the common law causes, which had been omitted in the enumeration in the statute. The list of, causes, thus enlarged or defined, would stand, from the bonds of matrimony at the common law: pre-contract; consanguinity, or relation by blood; affinity, or relation by marriage; and corporeal infirmity, or impotency; and from bed and board only at common law, adultery; and cruelty. There is added, by statute, three additional causes: willful desertion, or absence without reasonable cause for two years; habitual drunkenness for the space of two years; and conviction of felony, or other infamous crime. *Harman* v. *Harman, ibisupra.*

Now, insanity is not among the causes known to the common law, nor is it found among the new causes created and defined by our statute. Unless we assume to exercise a discretion, under the general language of the eighth section, we could hardly find a warrant for sustaining the bill. But we have, in the cases cited, already determined that no such discretion was conferred by the act. The pitiable misfortune of the defendant, who, for want of reason to guide her, appeared in the court below, and here, by a conservator, of the court's appointment, would hardly call upon us to make a precedent for casting her off from her only domestic stay and support.

If the contract is void, it could only be so upon grounds common to all contracts, that is, for want of sound mind, capable of making and assenting to a contract. Yet putting the contract upon that ground, and still the proof shows, that before, and at the time of, and for some time after the marriage, the defendant suffered only occasional paroxysms of insanity, and in the intervals was capable of all the duties of a citizen or a wife. The plaintiff would, upon the common principle, be required to show that she entered into this contract and relation during a period of mental incapacity, while under an insane paroxysm. The bill alleges the fact, and the evidence shows the contrary. Indeed, the plaintiff proceeds, according to his allegations and proofs, upon the ground that he was cheated and defrauded by a concealment, or a want of knowledge of the fact before the marriage. If this be true as a matter of law or fact, it would be ground of recovery of damages against those practicing the fraud, rather than a ground of rescission of the marriage contract itself, unless, indeed, the law guarantees to every husband a rational mental standard for the mind of a wife. I know of no such standard for lunacy or insanity. It is true, equity might protect a natural fool from pretenses of entering into such relations, by which others might seek to despoil them of their property. But idiocy is a very different thing from lunacy and insanity. Yet it may be that these, while laboring under paroxysms

rendering them totally incapable of consenting, would find a like protection from spoliations of the designing. An application on their behalf for protection against the designing and cunning, would present the question in a totally different light. A court of equity would find modes of protection, by appointing a trustee for the property ; and this might be done without rescinding the contract. Upon the power to rescind upon this ground, I am not now called on to decide, and would not without full examination. But so far as the existence of occasional paroxysms of hereditary insanity before marriage, and unknown to the husband, are presented as a ground of divorce, the question does arise, and, I am of opinion, affords no cause of divorce, nor general ground for rescinding the marriage contract on account of fraud, mistake or inadequacy.

So far from presenting features appealing to our feelings of sympathy or sense of justice, for this kind of relief, it rather wears the aspect of brutal insensibility, to cast off the poor, unfortunate wife and unoffending mother. If there be a period during the marital relation, when, more than at any other, the tenderest care, support and watchfulness of an affectionate husband is demanded, it is while the wife is helpless from sickness or insanity. To make this misfortune, the greatest that can befall us, the ground of the next greatest wrong and injustice, would be truly adding insult and injury to providential misfortune. But where to put the unfeeling husband who would thrust his wife away, because she had become totally incapable of self-care, must be left to the dictates of Christian humanity.

The procreation and nurture of children being one of the objects of marriage, the law has provided that corporeal infirmity, or impotency, before marriage, shall be cause to dissolve it. This provision is made for a sound body, but none for the mind. If there be here incongruity, inconsistency, irrationality, we can only say, we do not make, but interpret and apply the rule.

*Decree affirmed.*