HARRY KERN, by his guardian,

*v.*

RACHEL KERN or RACHEL JOHNSON.

In a suit by the husband, through his guardian, to annul a marriage on the ground of mental incapacity on his part, the evidence showed that he was of weak intellect, but until thirty-five years of age was permitted to take care of himself, and control his own property; that he preserved his estate, had a good memory, and manifested considerable shrewdness in business; that he seemed to have a proper conception of the marriage ceremony, and to understand the responsibilities attached to the marital relations.—*Held,* that the evidence does not justify an annulment of the marriage, though complainant was soon thereafter adjudged a lunatic, and confined in an asylum.

On bill, answer, replication and proofs.

*Mr. August Stephany,* for the complainant.

*Mr. Samuel E. Perry,* for the defendant.

GREEN, V. C.

This bill is filed to annul a marriage solemnized between Harry Kern and Rachel Johnson, on the ground of the alleged mental incapacity of Harry Kern to enter into a marriage contract.

The suit is not brought by the wife to be relieved of the contract on the ground that she has been deceived, nor is it an effort by the husband to be absolved from the responsibility he has assumed, but was instituted by his brother, Frank J. Kern, as next friend, it being alleged that Harry Kern was, at the time of the ceremony, and still is, a lunatic.

The bill avers that Harry Kern is the owner of an estate estimated to be of the value of $20,000. The brother, Frank J. Kern, who commenced this action, will become entitled, as next of kin, on his brother's death intestate, or if without testa-

mentary capacity and without lawful issue, to a portion of this estate.

Harry Kern's property was originally inherited from his father, but has been partially, at least, changed in character by the management of the alleged lunatic, who, it appears, has been left in the control of his estate until a period subsequent to his marriage.

He has been, since June 11th, 1892, confined in the state lunatic asylum at Trenton, under proceedings taken under the statute, based on certificates made by two resident physicians of Atlantic City, where he lived at the time of his marriage and subsequent thereto, which proceedings were taken after the marriage, at the instigation of his brother Frank, who also prosecuted an inquisition *de lunatico inquirendo* in this court, the writ being issued, and executed at Atlantic City, after his removal to the asylnm. The finding of the jury was

"that the said Harry Kern was, at the time of taking the inquisition, a lunatic and of unsound mind, and did enjoy 'lucid intervals,' so that he is not capable of the government of himself, his lands, tenements, goods and chattels, and that he has been in the same state of lunacy for the space of five years last past and upwards."

Subsequently, another brother, George W. Kern, was appointed by the orphans court of Atlantic county, guardian of the person and property of the adjudged lunatic, and said guardian having applied by petition, has been made the party complainant to prosecute this suit.

The marriage ceremony between the parties was solemnized at Atlantic City, on Wednesday, the 1st day of June, 1892, by the Rev. James H. Payran, a clergyman of thirty years' ministration at that place. He was called upon to perform the ceremony that evening, and went to the residence of Harry Kern in obedience to his summons. He was met on the street by the brother, Frank Kern, and, in consequence of what was said by him, instituted an investigation as to the mental capacity of Harry to enter into this contract. The clergyman appears to be a gentleman of education and keen perception, and states that

he engaged in a conversation with the bridegroom in order to satisfy his mind upon the question of his competency. He states that he would not have performed the ceremony without having been thoroughly satisfied on the point, his vigilance in that regard having been aroused by the interview on the street with the brother.

After a conversation lasting, according to his estimate of the time, from twenty minutes to half an hour, he says he saw no reason why he should not join the two in lawful wedlock.

There were present at the time, besides the parties in question, a brother of the bride and his wife, and Mrs. Sibley, the housekeeper of the brother Frank, he and Harry, at that time, living in the same house.

Preparations had evidently been made for the event. After the ceremony the minister was paid his fee and took his departure. The persons remaining partook of an entertainment which had been prepared, and, after the brother-in-law and his wife had left, the newly-married couple retired to their bed-room, where they slept together that night, during which the marriage was consummated.

The next morning, according to the wife's statement, her husband, in consequence of the opposition of his brother Frank and the housekeeper to his marriage, went to Philadelphia for the ostensible purpose of seeing another brother, George, who resided in that city. He remained in Philadelphia until the following Wednesday.

After his departure from home his wife returned to her brother, who lived but a short distance from the residence of Harry Kern. She left the house, as she says, in consequence of the manner in which she was treated by Frank and the housekeeper. So far as the housekeeper's treatment of her was concerned, it must have been prior to the marriage and during the evening, as the housekeeper says she went away the next day, before they were up.

On Harry Kern's return to Atlantic City he wrote the following note to his wife and sent it to her brother's house:

Kern v. Kern.

"Atlantic City

" My Dear Wife

"I rived home all right and come around to night I will fix all right x and dount worrow a Bout anything and hoping you are all well x  ·

"Your

" Dear Husbbean

" ant "

On receiving it she went to the house and shared his bed with him, and during that night sexual intercourse took place between them. This was the night of the 8th of June, and on the 11th, the warrant having been obtained, Harry Kern was taken, by the marshal of the city, to the lunatic asylum in Trenton. No notice of the proceedings *de lunatico*, which were initiated on the 22d of June, was given to the wife. He is still in confinement at the asylum.

The question is whether Harry Kern, at the time of his marriage, was of sufficient mental capacity to enter into a matrimonial contract. The clear weight of the evidence is that he was not a person of strong, healthy intellect; that his mental powers were, to some extent, impaired, and that such had always been his condition.

Every valid contract requires the concurrence of two or more persons, each of sufficient mental capacity to give an intelligent consent thereto. This requisite applies as well to matrimonial as to commercial and property contracts.

The old doctrine that the mind, although it has different faculties, is one and indivisible, and that, if any of its parts is disordered, or if it is any way diseased, or its healthy operation in any function disturbed, it is an unsoundness which affects the whole organ and renders the person legally of unsound mind and incapable of entering into a civil contract, is no longer recognized.

The question, under the present state of the law, is not whether the mind of the party was in any way affected or impaired, but whether, such being the case, the impairment or defect of the mind influenced or inspired the act which is the subject-matter of consideration. For, admitting that the party was subject to some delusion, or that his mind was in some faculty impaired, if the act challenged is not traceable to, and has

37

Kern *v.* Kern.

not probably been influenced by, the defect of intellect, but is the result, so to speak, of the action of the unimpaired faculties of his mind, it will not be disturbed.

The subject, in its relation to testamentary capacity, is considered by Vice-Chancellor Van Fleet in *Middleditch* v. *Williams, 18 Stew. Eq. 726* (reversed in *2 Dick. Ch. Rep. 585*, on a technical ground), and he there refers to the principal authorities. Chief-Justice Cockburn, in *Banks* v. *Goodfellow L. R. 5 Q. B. 549 (1820),* and in which he says the question was presented in that court for the first time, after considering the effect of delusion as presented in the case, says (at *p. 566*): "It may be here not unimportant to advert to the law relating to unsoundness of mind arising from another cause, namely, from want of intelligence occasioned by defective organization, or by supervening physical infirmity or the decay of advancing age, as distinguished from mental derangement, such defect of intelligence being equally a cause of incapacity. In these cases it is admitted on all hands that though the mental power may be reduced below the ordinary standard, yet, if there be sufficient intelligence to understand and appreciate the testamentary act in its different bearings, the power to make a will remains. It is enough if, to use the words of Sir Edward Williams, in his work on *Executors,* 'the mental faculties retained sufficient strength fully to comprehend the testamentary act about to be done.'"

Chief-Justice Bell, in *Concord* v. *Rumney, 45 N. H. 423, 428,* says: "In no case at the present day is it a mere question whether the party is insane. The point to be established is whether the party is so insane as to be incapable of doing the particular act with understanding and reason."

There seems to be less difficulty in bringing to a test the acts of a person whose mind in its normal condition had been sound, but which has subsequently become affected and subject to some delusion, than to establish any test with reference to the acts of one whose mind is weak or undeveloped, for, in the first class, the characteristics of the mania or delusion will probably make themselves apparent in the act, while as to the other, the border line between mental capacity and imbecility is so dim and indefi-

nite, that it is often difficult to determine whether the act has been guided by the light of reason, or done within the shadow of a darkened intellect.

The rule as to the mental capacity requisite in cases of ordinary contracts is well settled in this state and is thus stated by Vice-Chancellor Van Fleet in *Davren* v. *White, 15 Stew. Eq. 569*: "The test in the class of cases to which this case belongs is, did the person whose act is brought in judgment possess sufficient ability at the time he did the act to understand, in a reasonable manner, the nature and effect of his act or the business he was transacting? If he did, his act is valid. He may have been old or enfeebled by disease, or irrational upon some subject, yet if he had sufficient ability to comprehend, in a reasonable manner, what he was doing, his act will bind him. This is the rule in the absence of fraud." See, also, *Lozear* v. *Shields, 8 C. E. Gr. 509; Eaton* v. *Eaton, 8 Vr. 108; Hill* v. *Day, 7 Stew. Eq. 150; Blakeley* v. *Blakeley, 6 Stew. Eq. 502.*

The weight of the authorities is that no greater, if as much, mental capacity is requisite to make binding a matrimonial, than is required for ordinary business contracts or a valid testamentary disposition of one's estate.

In *Turner* v. *Myers, 1 Hagg. Cons. 414*, Sir William Scott says: "Matrimonial contracts require the same mental capacity as any other contract." Yet the court, *Re Glen, 4 Desaus. Eq. 546*, says: "The answers given by her certainly show some understanding, although a defective one, and these afford higher evidence of the true state of her mind than the opinions of any witnesses on the subject could do. There may be so much imbecility as to render her incapable of making contracts which would bind her estate, but this imbecility does not appear to exist in so great a degree as to incapacitate her from contracting marriage."

Judges have made attempts to formulate some rule to be applied as a test, without any very satisfactory results. In *Browning* v. *Reane, 2 Phillim. 69*, Sir John Nicholl says: "If the incapacity be such, arising from either or both causes [idiocy or lunacy], that the party is incapable, from mental imbecility, to

take care of his or her own person and property, such an individual cannot dispose of her person or property by the matrimonial contract any more than by any other contract." Objections have, however, been urged to this attempted solution of the problem. *1 Bish. Mar., D. & S.* §§ *589, 599.*

As is said by Sir James Hannen, in *Durham* v. *Durham, 10 Pro. Div. 80, 82 :* "Every case of this kind must be decided upon its own facts. Nor do I consider that it would be useful to borrow from my predecessor or to attempt myself to form any exact definition of what constitutes soundness of mind. I accept, for the purpose of this case, the definition which has been substantially agreed upon by the counsel, to whom I have to express my obligations for the very able assistance they have given me, namely, a capacity to understand the nature of the contract and the duties and responsibilities which it creates. It is to be observed, however, that this only conceals for a moment the difficulties of the inquiry, for I have still to determine the meaning to be attached to the word ' understand.' If I were to attempt to analyze this expression, I should encounter the same difficulties at some other stage of the investigation, with reference to some other phrase, and I shall still have to determine, on a review of the whole facts, whether the respondent came up to the standard of sanity, which I must fix in my own mind, though I may not be able to express it. I may say this much in the outset, that it appears to me that the contract of marriage is a very simple one, which does not require a high degree of intelligence to comprehend. It is an engagement between a man and woman to live together and love one another as husband and wife, to the exclusion of all others. This is expanded in the promises of the marriage ceremony by words having reference to the natural relations which spring from that engagement, such as protection on the part of the man and submission on the part of the woman. I agree with the solicitor-general, that a mere comprehension of the words of the promises exchanged is not sufficient. The mind of one of the parties may be capable of understanding the language used, but may yet be affected by such delusions or other symptoms of insanity as may satisfy the.

tribunal that there was not a real appreciation of the engagement apparently entered into."

The same learned judge, in the same book (at *p. 95*), in *Hunter v. Edney*, says : "The question which I have to determine is not whether she was aware that she was going through the ceremony of marriage, but whether she was capable of understanding the nature of the contract she was entering into, free from the influence of morbid delusions upon the subject."

Mr. Justice Houston, in *Elzey* v. *Elzey, 1 Houst. 308, 319,* says : "It would be dangerous, perhaps, as well as difficult, to prescribe the precise degree of mental vigor, soundness and capacity essential to the validity of such an engagement, which, after all, in many cases depends more on the sentiments of mutual esteem, attachment and affection, which the weakest may feel, as well as the strongest intellects, than on the exercise of a clear, unclouded reason, or sound judgment, or intelligent discernment and discrimination, and in which it differs, in a very important respect, from all other civil contracts."

Mr. Bishop, in *1 Bish. Mar., D. & S. §§ 599–601, inter alia,* says : "Marriage is the legal bond around affections assumed to be already united, and the blending in law of two lives into one. And while it is in some degree of the head, it is primarily and chiefly of the heart. Hence, in reason, the test question should be whether or not the parties have the capacity of mind required for duly comprehending this union. * * * The question * * * in a marriage case is whether the alleged insane person acted rationally regarding marriage and the particular one in dispute, not, indeed, whether his conduct was wise, but whether it proceeded from a mind sane as respects the thing done. * * * Practically, persons coming together in true marriage—not in mere marriage for convenience—say together in effect : ' We so love each other that we bind ourselves in law to continue this love, and live together in the way of husband and wife, in mutual dependence and support, to the exclusion of all adverse loves and doings, during our joint lives.' If this is sanely done, it is marriage ; insanely, it is not. And any added description of capacity for a mental process which, in fact, is but rarely

gone through with by anybody, is believed to be more confusing, especially to a jury, than helpful."

The weight of the evidence regarding Harry Kern's infirmity is that his mind has not been fully developed, and the question is, had he sufficient mental capacity to understand the marriage contract? This is not to be solved by the mere opinions of persons who have been brought in contact with him, for, however eminent may be the authority, we must, on such an issue, be guided by the conduct and acts of the party when he has been called upon to exercise such abilities as he may possess. Each case must be decided on its own circumstances, and the ability of the party to understand can be ascertained in no more satisfactory way than by referring to his conduct in other transactions. A result so important to this defendant as the nullity of her marriage should not be reached except on the most convincing proofs of facts to sustain the grounds on which it is sought to be predicated.

Mr. Justice Carruthers, in *Cole* v. *Cole, 5 Sneed 57,* says: " But every consideration of policy and humanity admonishes us that a contract so essentially connected with the peace and happiness of individuals and families and the well-being of society should not be annulled on this or any other ground not clearly made out. The consequences in many cases would be most deplorable. The right of property would be unsettled and the peace of families destroyed, to say nothing about the effects upon the innocent offspring. The annulment of other contracts could only affect property, but this could do that and more—it could tell upon the happiness, character and peace of the parties. The appalling character of these consequences is well calculated to inspire the courts with the solemn duty of requiring a clear case for the application of the general principle to this delicate and important contract."

The evidence produced by the complainant in support of the allegations of unsoundness of mind of Harry Kern consists, in the first place, of the inquisition; next, the medical testimony, and lastly, the evidence of persons as to his conduct and conversation.

*First.* As to the inquisition.

It is insisted on the part of the complainant that this finding is not only *prima facie* evidence of the unsoundness of mind therein found, but that, under the statute of *15 Geo. II. ch. 30,* passed in 1742, it renders the marriage absolutely void.

But this marriage took place previous to the inquisition, and the statute only makes null and void the marriage of a person who has previously been found a lunatic by an inquisition. Sir John Nicholl, in *Portsmouth* v. *Portsmouth, 1 Hagg. 355,* where the commission had been executed in 1823 and the marriage attacked had been solemnized in 1814, says: "The verdict would not, of itself, affect the validity of the marriage *de facto* solemnized, though solemnized within the time of the finding by the jury. The finding is a circumstance and a part of the evidence in support of the unsoundness of mind at the time of the marriage, but no more, for this court must be satisfied, by evidence of its own, that grounds of nullity existed."

But, again, it was of too recent enactment to be called part of the common law, and there is nothing to show that the statute was in operation in the colony before July 2d, 1776, to bring it within the clause of the first constitution. Besides, its phraseology indicates that it could only have been intended to be enforced in Great Britain.

The inquisition is competent evidence as *prima facie* proof of the finding therein contained, but is not conclusive. *Hunt* v. *Hunt, 2 Beas. 161; Yauger* v. *Skinner, 1 McCart. 389; Hill* v. *Day, 7 Stew. Eq. 150; Mott* v. *Mott, 4 Dick. Ch. Rep. 192.*

The medical testimony offered by the complainant was that of four physicians. Dr. Fricke, who was the family physician of Harry Kern's parents, and who had been called in to attend him, says: "His mind was diseased; he was what we call an insane man or a crazy person, that is, speaking from a medical point of view;  * * *  he was in a disturbed mental condition and not fit to take care of himself and his property." Prior to 1887 he was all right, so far as the doctor knew, "but he was such a kind of intelligent fool he could never be sent to school;" and when asked what his delusions were, says that "he was

Kern v. Kern.

afraid; he could not go out alone for fear people would jump on him and injure him," and " he would not go out without his brother George being with him;" again, that "George would be injured and that he should not go out alone; that he was afraid he would be injured; * * * it was, in common language, what is called 'mania;' his delusions had grown on him;" the doctor never considered him "a person entirely demented, not an imbecile and born so, but he was not very bright."

Dr. Ward, the eminent medical chief of the state asylum at Trenton, testifies, as the result of his almost daily examination, from the 12th of June to the time of the trial, that Harry Kern's case is "one of congenital imbecility, which means that he was born so, and he is not a sane man in that sense and never has been;" that " he may have a proper appreciation of what is going on, but could not form a rational judgment with reference to the effect of it;" that he " could know that he was getting married, just as well as anyone, but would not consider the consequences, at all; that " he might make a good bargain, but has not the ability to reason from cause to effect;" that "he is liable to be imposed on by persons for whom he had formed any particular liking." He says: "In insanity there are cases that have what are termed 'lucid intervals,' in which there is a suspension of active delusion; in imbecility there is no such condition; there is no suspension of delusion; the man has no delusions in that sense; he knows, in a general way, what he is about, just as a small boy would know what a sweet apple is, but he cannot reason from cause to effect;" that in Kern's case " there is no diseased condition in the sense that 'lucid intervals' may exist; * * * it is a want of development—a non-existence of reason;" that " it is certain he is not a subject of mania; he is a case of congenital imbecility; that, and nothing more or less."

Dr. Armstrong, who has been his attending physician for some years, says he concluded he was in a condition of unsound mind; that "his mind was weak—never had been developed;" that " he was in a condition you would not consider in good sound sense; did not think him mentally balanced;" that " there was a lack of mental vigor; that his mind was not right."

He seems to base his opinion of the unsoundness of mind on the fact that he was subject to delusions in reference to his physical condition—continually imagining, without reason, he was suffering from different complaints, and, as a marked delusion, that he has an ability to physically see. the inward organs of another person's body.

Dr. Wright, the other resident physician, who was also a member of the commission that executed the inquisition, and on whose certificate he was sent to the asylum, had never had any interview with him except on one occasion, when he went to his house for the purpose of making an examination, and when Kern talked at first quite rationally, but later foolishly with reference to a horse.

The doctor says "his mind was demented; perhaps not what you call an imbecile, but really unsound—insane; I should take it that way," and "should judge it was an inherent condition."

To summarize these medical opinions : Dr. Fricke thinks that he is not an imbecile and born so, but is subject to mania, with the delusion that persons might injure him or his brother George; Dr. Ward, that his case is one of congenital imbecility, nothing more nor less; that he has no delusions in the ordinary sense; that it is a want of mental development, a lack of ability to reason from cause to effect.    Dr. Armstrong, who rather agrees with Dr. Ward in his characterization of the mental condition, bases his opinion on the presence of delusions, as to his having certain diseases and his ability to see inside the bodies of other persons.    Dr. Wright, who says he is not an expert on insanity, also thinks his condition inherent and one of imbecility, and that he had a very unsound, a very unreliable mind, and forms his impression from his disconnected conversation, which was unintelligible at times.

The abstract opinions of medical experts as to a person's mental condition may be entirely satisfactory in the consideration of the subject from a medical standpoint, but in the solution of questions involved in judicial investigation, they must be tested and qualified with reference to the facts on which such

opinions are based. A man may be mentally unsound in a medical point of view, from certain conditions which exist, which would not, in a legal sense, relieve him from responsibility. He may be subject to mania, and, medically, of unsound mind, yet if the peculiar phase of mania had no influence upon the act brought in question, such act is not, in the law, invalidated; he may be an imbecile and, medically, of unsound mind, but if he has sufficient mind to reasonably understand the act which is brought in question, he is legally competent. To judicially determine if the person is, in a legal sense, of unsound mind, we must therefore have the facts on which medical gentlemen have proceeded in forming their opinion.

The mental unsoundness indicated by the testimony of the doctors other than Dr. Ward, as well as of the other witnesses, consists of what is called in the evidence " delusion," as well as what is really weakness of intellect. The manifestations which are called " delusions " by the doctors and the witnesses, are: (1) That he or his brother George would be injured if they went out alone—an unreasonable fear of personal violence; (2) that he had certain diseases; (3) that he could physically see inside of other persons' bodies. The last is the only one that can in any proper sense be said to be a delusion, or " the spontaneous conception and acceptance of that as a fact which has no real existence except in his imagination, and his persistent adherence to it against all evidence." *Smith* v. *Smith, 3 Dick. Ch. Rep. 566.* It is certainly a harmless fancy and one which could not affect a person's mental capacity to understand the marriage contract. As to the others, men and women of more than average intelligence have been subject to groundless fear of personal safety, and to an imaginary belief of their having some particular disease, without a suspicion being raised as to their mental soundness.

The inquisition finds that Harry Kern is insane and of unsound mind with lucid intervals, and this would seem to be the opinion of Dr. Fricke. If this is to be considered as the correct description of his mental condition, the question to be solved, as the controlling one in this investigation, is whether

he, at the time of entering into the marriage contract, was enjoying a lucid interval.

If, on the other hand, Dr. Ward correctly states that condition, the inquiry must be, was his mind so undeveloped as to incapacitate him from understanding the marriage into which he entered? Imbecility is a condition of degree, and may vary from absolute idiocy to almost ordinary mental strength.

I see, however, no practical difference so far as this investigation is concerned, because we must ascertain if his mind was such, in the eyes of the law, as to render him responsible to the obligations of the contract entered into, whether it is with reference to a lucid interval or with reference to a continuing condition of weakness.

We find that his brother and family had, up to the time in question, permitted him to deal with his whole estate, and we have instances proved where he has negotiated contracts and has displayed prudence and judgment in making the bargain.

Dr. Ward says that he would "regard it as very unsafe for him to transact business, and that he cannot do it with any safety either for himself or for anyone else for any long period of time." Which I understand to mean that it would not be safe for his estate for him to embark permanently in any business as an employment. He says, further: "It is quite possible he might make a very good bargain, but he has not the ability to reason from cause to effect. As in cases of every imbecile, he might make a good bargain and he might show a good deal of acquisitiveness, but any friends or any person for whom he had formed any particular liking could take all his property away from him." Again, "I think that he could have made a contract at any time as well as he can now. He has no idea of reasoning; he does not consider from cause to effect in his conclusions." It is quite apparent that the undevelopment of Harry Kern's mind, which Dr. Ward regards as its chief defect, is the inability to reason from cause to effect. His memory of past events is accurate, his perception of the present clear, but he cannot correctly reason from cause to effect as to what will result from what he or others do. While I do not question the cor-

rectness of Dr. Ward's opinion, I must inquire, is the infirmity so great as to invalidate this marriage?

We find that he has manifested shrewdness and judgment in the purchase and management of his property. He and his brother Frank each purchased property at Pleasantville, and his brother Frank having made a contract for fruit trees to be put out on the place, he entered into negotiations with the agent who had furnished those trees to supply him for his own property. This was consummated by writing a letter, of which the following is a copy:

"April 12, 1892.

"*Mr. Marcus Harris:*

"DEAR SIR—Please send me the same kind of fruit trees you sold my brother Frank, 50 trees, and send me word when they will be delivered in Pleasantville, so I can attend to them, and oblige, Harry Kern, 120 North Massachusetts Ave., Atlantic City."

Indicative of a true conception of the conditions under which his brother made his purchase, and an appreciation of what was necessary in the improvement of his lots. This was afterwards followed by another negotiation with the same person, which was carried on orally, an account of which is given in detail by the witness, who made a memorandum order in his book, specifying the number and kind of trees, shrubs and rose bushes, part of which were to be shipped to Pleasantville, and the others to Atlantic City, which memorandum was signed by Kern in his own handwriting. This transaction would indicate that he understood what was wanted at one place and what at the other, and on the 2d of June, the day after the marriage, the same witness says he saw him in the yard of his house, and said to him, "'Mr. Kern, you ought to beautify this yard.' 'Well,' said he, 'do you do this kind of work?' and I said, 'Yes,' and he said, 'What do you think it will cost?' 'Well,' I said, 'it is according to how many trees you want; if you get the trees of us, we will make a contract to lay it out for you,' and he said, 'You send me the trees, and then we will talk about it after the trees come.'" The witness says that in these transactions he talked like a person who had his senses—like a sane

Kern v. Kern.

man, like a man who knew what he was doing; that if he had had any doubt about it he would not have sold him the goods.

He purchased a piece of property of Mrs. Annie Spittall, consisting of a house and lot, with the furniture in the house. He made an examination of the property himself. He walked through the house and through the barn, looked at the furniture, and on inquring the selling price, attempted to buy it cheaper; being unable to do so, he closed the bargain for $1,800.

His brother Frank was with him on this occasion and attempted to get the better of his brother by offering $50 more for the property, but Harry had concluded the purchase at the price named, and prided himself on not having been overreached by his brother.

There were two mortgages upon the property, one of $900 and the other of $150, which he was to take up and pay the difference in cash.

Mr. Spittall says that after his wife told him she had sold the property to Harry, he said to him, "Your brother Frank has offered $50 more, and I don't want to sell the property for what you offer;" and he said, "Do you see any green in my eye? I bought the place and made the contract, and paid something on account, and I am going to have the place; you cannot sell it to anybody else." He then told him that he would not sell it for that, but Kern replied, "You will have to sell it for that, because I paid a forfeit for it and I am going to have it." After some conversation, the matter was closed, and Kern asked him to wait a couple of weeks, so that he could get the title right. Afterwards he met him in the street, in front of Judge Sensemen's office, who was to prepare the papers, and he said to witness, "I wish this real estate agent would hurry up; I have got some other business to attend to." Judge Sensemen came and the matter was settled up, and the witness then arranged with the mortgagee so that Kern could take up the $150 mortgage; and as he was going away he said to witness, "I want to see Mr. Miller. [Mr. Miller held the other mortgage.] I want to take up the first mortgage of $900; you interceded for me with Mr. Hyland;" and witness replied, "Yes, and I will do so with Mr. Miller;" and then the witness said to Kern, "You

will give a fellow a quarter to drive up the street," and he said, "Oh, no, you have had enough of my money to-day." He did arrange with Mr. Miller, who was paid.

Mr. and Mrs. Spittall both say that in these negotiations there was nothing out of the way; that Harry's actions did not excite any suspicion; that he did nothing out of the ordinary run of business in talk or in action, and seemed to know more than his brother did; that his actions were not peculiar or different from the ordinary run of business men; that he was just as rational as the witness was at the time he was testifying, and in a vigorous way.

Judge Sensemen says that he did not notice anything peculiar in the actions of either of the brothers, and both seemed to carry on their business as the ordinary run of mankind, although he did not know who was who; that he did not notice anything peculiar at that time or at any other time, in their actions, and that if he had he would not have had anything to do with them.

While I, of course, place great reliance upon the opinion of Dr. Ward—immeasurably more than on the opinion of any or all the other physicians, and accept his opinion that Harry Kern's infirmity is a lack of mental power to fully reason from cause to effect—these two transactions certainly bear evidence that, with reference to these business matters, he had some power to so reason.

Without attempting to formulate a rule to be adopted as the test of mental development of a person afflicted with congenital imbecility, necessary to exist so as to bind him in making a contract, recognizing that each case must be governed by its own incidents, it seems to me that if Harry Kern, in a general way, had an appreciation of the conditions of the marriage state and understood the rights and responsibilities which attach thereto, and ·regarded the marriage ceremony as the incident which effected a marriage between himself and Rachel Johnson, that he should be held bound by a contract which he entered into under those conditions.

There is no evidence in the case of conspiracy. It is charged in the bill, but the proof is absolutely wanting.

Kern v. Kern.

The wife is but eighteen years of age, not unattractive in appearance, of simple manners and evidently an unsophisticated country girl. There is not a shadow of suspicion cast upon her character, and the only unfavorable comment that can be made is that she displayed a lack of sensitive female delicacy in having gone to his house, where the wooing seems to have taken place. This may, however, be attributed to the manner of her bringing up and her want of knowledge of conventional custom.

His attention seems to have been attracted to her while she was on the street with a companion whom he knew, and having engaged her in conversation, he commenced his attentions by presenting her with flowers. That a simple-minded country girl might have been properly touched by his attention can easily be understood—his kindness in presenting her with flowers and other tokens of preference naturally excited her gratitude and affection. We have no detailed account of the progress of the courtship, but it was no secret in the neighborhood, and led in a short time to their engagement. At this stage he showed that he knew what would please her, as well as his appreciation of the situation, and presented her with a bird, two rings and a gold watch. The girl was poor and he was comparatively well to do, and had a clear idea of what should be done in the way of providing her not only with these little tokens of affection but with the means to procure for herself a wedding outfit.

Henry Spittall, from whom the house had been purchased, says some time before the marriage he saw him in the street and said to him, "I wish you much joy," and Kern said, "About what?—what about?" Witness said, "I hear you are going to get married," and he said, "Oh, that is all right." Witness says, "Well, you want a bird for the cage that you have got, now," and Kern said, "I will soon have the bird."

He made the preparations at the house for the wedding, and answered satisfactorily the inquiries of the attending clergyman, Mr. Payran. The latter had been warned against marrying Harry by the brother who commenced this prosecution, and being thus put upon his guard, felt it his duty to carefully investigate

the matter, and with this object in view he entered into a conversation with the groom, until he was entirely satisfied that he was in a mental condition to justify him in performing the ceremony, which he thereupon did. The answers were very intelligent, and he carried on the conversation in such a way as to impress the minister with his entire mental ability to go through such a ceremony and to make such a contract. He says that all Harry's answers were remarkably correct, without hesitation, and accurate.

It has been held, in *Anonymous, 4 Pick. 32*, that the fact of a party being able to go through the marriage ceremony with propriety, was *prima facie* evidence of sufficient understanding to make the contract. While, as Mr. Bishop suggests, this is laying down too strong a rule, there can, I think, be no doubt that it is a matter of signal importance in considering such a question as the one involved in this case, that the party conducted himself, in a preliminary conversation with the clergyman, in such a way as to impress him with his sanity, and intelligently bore himself through the ceremony of marriage.

Dr. Ward says upon this point:

"*Q.* He may have a proper appreciation of what is going on, but you think he cannot form a rational judgment with reference to the effect of it?

"*A.* Exactly; in the very thing under question, he would know that he was getting married just as well as any of us, but he would not consider the consequences at all.

"*Q.* But he would know what he was doing?

"*A.* Yes, he would know what he was doing—that he was getting married and that a preacher was present—but he would have no proper idea of the act he was performing or a proper conception of the solemnity of the act; he would not to-morrow realize the consequences of his act."

In this testimony the doctor but gives another phase to his judgment that Kern's condition of mind would not permit him to reason from cause to effect. But we must examine this in the light of all the circumstances attending the marriage and subsequent thereto. Up to the point of the ceremony, he seems to have had a proper appreciation of what he was doing, and of the consequences of the different steps he was taking, leading

Kern *v.* Kern.

up to the marriage. The preparations which he made not only in furnishing his intended bride with the means of purchasing the necessary articles, but also the preparation he made for the wedding, were, to a certain extent, the exercise of the reasoning power from cause to effect. He certainly understood his marital rights, and took advantage of them in the consummation of his marriage. It appears, by the testimony of all the witnesses, that his memory was excellent, it might be said accurate, a condition which Dr. Ward says is entirely consistent with that of congenital imbecility. He appreciated the opposition made to his marriage by his brother Frank and the housekeeper, and went to Philadelphia to see his other brother, George. When he returned home, he still recognized his position as a husband and sent to his wife to return to his house and bed. Within a day or so he was forcibly removed to the asylum, but has not lost his impressions with reference to his duties as a husband. He was confined on the 12th of June. Dr. Ward was examined on the 15th of November, and says that he speaks frequently about his marriage; that "he spoke to him about it the last Sunday, and speaks of the provisions he is going to make for his wife, says he is worth $75,000, and he is going to make such extensive provisions for his wife, and is going to build a very handsome house in Atlantic City for his wife—he is extravagant in his ideas, just as a person in his mental condition would be," and he speaks of his brother and wonders why he put him in the asylum; that he explained why he carried a pistol by saying that people were opposed to his marriage, and he wanted to defend himself. He said that people laughed at him because he had got married, and he was going to defend himself; and he told the doctor that some people wanted to get his wife away from him, and he was going to shoot them if they did, which the doctor says he probably would have done.

While the conditions are no doubt sufficient to class Harry Kern as of unsound mind from a medical standpoint, I do not think he can be said to be legally irresponsible. He shows mind enough to successfully manage his estate; to know the probable effect of his attentions to a young girl; to understand

38

the engagement of marriage, and to do what is usual under such conditions; to talk intelligently to the minister, and to conduct himself with propriety during the ceremony; to avail himself of his marital rights, and, although confined for months in a lunatic asylum, remembers and speaks of the duties and responsibilities he owes as a married man. This is certainly evidence that he reasonably understood the marriage contract.

The last class of testimony offered by the complainant is that of witnesses with reference to his conduct and conversation.

It is noticeable that Frank Kern, the brother who instituted this action, does not present himself as a witness.

The testimony of the housekeeper would indicate the existence of a fear of bodily injury either to himself or his brother Frank, as well as an unnatural feeling towards a sick aunt, with whom they were at one time living.

The testimony of Mr. Capper is to the effect that he regarded his marriage lightly, and spoke jestingly of his ability to marry others, and of an occasion when he seemed unduly excited by what had taken place between himself and some gentlemen on whose property they were apparently trespassing.

These incidents strike me as inconsequential when compared with the testimony on the other side, part of which has been referred to, of his having taken charge of his property, his being permitted to not only own but use a horse and fire-arms, and to deal in real and personal estate, and that on the night when he saw Mr. Capper, he wrote the note to his wife, telling her to come to his home, and the fact that he constantly speaks of his marriage and his duties.

The testimony of the marshal that Kern became exceedingly violent at the depot at Trenton, while on his way to the asylum, does not indicate any unsoundness of mind, for I think it would be difficult to find anyone who would patiently submit to be taken in charge by an officer without any explanation whatever, and on the commencement of his resistance, should be handcuffed.

There is evidence that there is insanity in the family. His father died in an insane asylum and a brother is also confined in

Kern *v.* Kern.

an asylum in Pennsylvania. While this is entitled to consideration, it is, of course, in nowise controlling.

There is evidence that steps had been previously taken to place him, also, in confinement, and that he was aware of it; also, that he was fearful of personal attack upon himself and upon George. All these conditions would readily account for a person of his capacity arming himself, and that he had with him several weapons may be explained by these circumstances. There is, however, no proof that he attempted to make use of these weapons, although there is evidence that on one occasion he did chase some people from his house with a knife, but we do not know the circumstances which led up to this exhibition of passion.

We have, as the result of the evidence, that Harry Kern is a person of weak intellect—one who, at times, may not express himself coherently, but who, until he was thirty-five years of age, had been permitted by his family to take care of himself and his property; who has contracted no bad habits and who has so taken care of his estate that it has been preserved, if not increased; whose memory is good; who, in making a bargain, manifested shrewdness and judgment, and who, in reference to the marriage in question, conducted himself without impropriety or peculiarity; that he seems to have had a proper conception of the ceremony which was being performed and to understand the rights, duties and responsibilities which attach to the marital relation.

This court will not be justified in annulling a marriage entered into under such circumstances, because of the alleged weakness of intellect of a contracting party.