46 N.J. Super. 583 (1957)
135 A.2d 232
JOHN B. HOULAHAN, PLAINTIFF,
v.
JOSEPHINE HORZEPA, FALSELY CALLED JOSEPHINE HOULAHAN, DEFENDANT.
Superior Court of New Jersey, Chancery Division.
Decided October 4, 1957.
*584 Messrs. Turp & Coates, attorneys for plaintiff.
Mr. George Warren, guardian ad litem for defendant, pro se.
MARIANO, J.S.C.
This is a suit for the annulment of a consummated marriage on the grounds that at the time of the ceremony the defendant was incapable of consenting thereto, and also for fraudulent concealment of mental illness. The defendant is represented by duly appointed guardian ad litem, George Warren, Esquire.
The parties first met in the Fall of 1949, and beginning the early part of 1950 they saw each other frequently. In February of 1950 they became engaged, after which he saw *585 her daily. From February 1950 to April 15, 1950, the date of the marriage, the defendant's conduct and behavior were normal in every respect. She attended showers given by her friends and participated in the preparations for the marriage. She also manifested a proper appreciation of what she was doing and the consequence and significance of the different steps and occasions leading to the marriage.
The evidence demonstrates that the defendant had a proper conception of the marriage ceremony and understood the responsibility attached to the marriage relationship. A reception following the ceremony was attended by several hundred people. She acknowledged their presence and conversed with them and accepted their congratulations, and generally conducted herself in a proper manner under the circumstances. After the reception the defendant drove their automobile to the State of Virginia where they spent their honeymoon.
Plaintiff testified that he exercised his marital rights.
Plaintiff further admits that prior to his marriage he was aware of the fact that defendant had been hospitalized, but he did not know it was in a mental institution. Testimony was produced to show that on March 7, 1950 he spoke with the defendant's mother, stating to her that he had been informed of her previous nervous breakdown; also prior to the marriage he accompanied his wife to a physician so she could receive medical treatment for a stomach disorder. There is also testimony in the case that the plaintiff was informed by the defendant's brother that she had suffered a nervous breakdown prior to the marriage.
Plaintiff frankly admits that at no time prior to the marriage did he inquire of the defendant as to whether she had been confined in a hospital of any type whatsoever. It was not until November 1951 that he ever suspected that his wife had been committed to a mental institution prior to his marriage.
In the present case the defendant entered Bellevue Hospital in the State of New York on March 17, 1945, and was committed March 20, 1945 by Bellevue Hospital to *586 Brooklyn State Hospital, where she entered March 21, 1945 and was confined to October 17, 1945, when she was put on convalescent care and discharged in the custody of her mother for a period of one year. On October 17, 1946 the patient was discharged as recovered. The diagnosis was dementia praecox  catatonic type.
Two years thereafter, on November 17, 1948, defendant was admitted to the Kings Park State Hospital in New York State from Kings County Hospital. On April 9, 1949 patient was placed on convalescent care and released in the custody of her mother for a period of three months. On July 9, 1949 the patient's three months' period of convalescent care having expired, patient was discharged "much improved."
Within less than a year after the discharge above mentioned the defendant married plaintiff on April 15, 1950. Within less than three months thereafter she showed signs of mental illness and was placed as a voluntary patient in the Glenwood Sanitarium in Hamilton Township, Mercer County, New Jersey. She remained there just a short time, but the diagnosis was dementia praecox  paranoid type. At the time of discharge it was reported that she was in a state of partial remission. She left the sanitarium in August 1950. From August 1950 until November 1951 defendant and plaintiff resided together but under considerable difficulty, and the ability to live together was entirely due to the patience and loving kindness of the plaintiff. After defendant left Glenwood Sanitarium there was no sexual intercourse between plaintiff and defendant because of her condition. On November 26, 1951 she was admitted as a voluntary patient to the New Jersey State Hospital at Marlboro where she remained until February 8, 1952, when she was discharged, upon request, "much improved." The diagnosis was dementia praecox  catatonic type. Upon her discharge from the hospital she returned to the home of plaintiff and remained until June of that same year, when she was committed to the New Jersey State Hospital at Marlboro upon the certificate of two doctors. She has been confined there since that time, although on at least one occasion she was *587 home for a short period of time on visit. The diagnosis is dementia praecox  catatonic type.
Plaintiff admittedly, as far back as August of 1950, was aware that his wife had been mentally disturbed. It was at this time that he personally accompanied her to a psychiatrist. Two years thereafter, except for very short periods of institutionalization, he continued to live with the defendant, without having intercourse after September 1950. Undoubtedly, plaintiff was solicitous and attentive to his wife, with full awareness of her mental history. On January 1953 he took his wife from the hospital and brought her to their home for approximately two months until he returned her to the institution.
N.J.S. 2A:34-1, subsection (d) provides:
"The parties, or either of them, were at the time of marriage incapable of consenting thereto and the marriage has not been subsequently ratified, provided that where the party capable of consent, is the applicant, such party shall have been ignorant of the other's incapacity at the time of the marriage and shall not have confirmed the marriage subsequent to the regaining of capacity by the other party."
It is conceded by the attorney representing the plaintiff, and properly, that the evidence proved the defendant was capable of consenting to the marriage. See Kern v. Kern, 51 N.J. Eq. 574 (Ch. 1893).
Apart from the statute, N.J.S. 2A:34-1(g), equitable jurisdiction to annul a ceremony of marriage for antecedent causes stems from Chancery's general authority to grant relief from contractual undertakings induced by fraud. Lindquist v. Lindquist, 130 N.J. Eq. 11 (E. & A. 1941); Carris v. Carris, 24 N.J. Eq. 516 (E. & A. 1873); Akrep v. Akrep, 1 N.J. 268 (1949).
The following rule is well established in New Jersey: The fraud required to annul consummated marriage must be of an extreme character and in an essential of the marriage relation, but unconsummated marriage is little more than engagement to marry and can be annulled for fraud which will render ordinary contract voidable. Lindquist *588 v. Lindquist, supra; Akrep v. Akrep, supra; Rhoades v. Rhoades, 10 N.J. Super. 432 (App. Div. 1951).
Though marriage becomes valid before consummation, still the non-consummated status wherein unborn children and the community have not yet acquired the specially grave and weighty interest, is very different from the consummated one. Cohabitation ripens the marriage to a public concern and policy. In any action for divorce and annulment the public is always a party and has a real interest.
Plaintiff in his oral argument and memorandum admits that in order to obtain an annulment he must prove that at the time of the marriage the defendant suffered from some condition which went to the essential of the consummated marriage, and that this condition was fraudulently concealed.
Plaintiff relies upon the history of institutionalization in two mental hospitals four years apart and prior to marriage as constituting a condition which goes to the essential of the marriage; further, that in view of the fact that marriage took place nine months after her second discharge, the defendant's failure to disclose this mental history constitutes fraudulent concealment. This position lacks merit because our courts have on occasions in the past reached contrary conclusions.
In Buechler v. Simon, 104 N.J. Eq. 572 (Ch. 1929), the factual situation is substantially similar to the matter sub judice, except that wife's hospitalization took place 19 years before marriage. It was held that concealment of incarceration in a lunatic asylum by itself was no ground for annulment.
The decision did not, nor must this one, turn on the question of defendant's health, for the complaint was grounded on the fact that defendant fraudulently concealed her condition. The jurisdiction to relieve for fraud must be founded in deceitful suppression of the truth; the suppression must be willful, with intent to deceive, and must go to the essential of the marriage relation. The defendant on her own volition made no statement as to her physical *589 or mental condition, nor did the plaintiff request any information concerning the same. No proof was produced from which it could be concluded that defendant deceitfully concealed her prior confinement. Silence, resting in honest belief of things false, is not actionable at law or in equity. All the following cases of annulment rest on deceit: Carris v. Carris, supra; Crane v. Crane, 62 N.J. Eq. 21 (Ch. 1901); Davis v. Davis, 90 N.J. Eq. 158 (Ch. 1919); Bolmer v. Edsall, 90 N.J. Eq. 299 (Ch. 1919); Ysern v. Horter, 91 N.J. Eq. 189 (Ch. 1920); Dooley v. Dooley, 93 N.J. Eq. 22 (Ch. 1921); Steerman v. Snow, 94 N.J. Eq. 9 (Ch. 1922); Daniele v. Margulies, 95 N.J. Eq. 9 (Ch. 1923); Gruber v. Gruber, 98 N.J. Eq. 1 (Ch. 1925).
In addition to proof of the marriage and of residence, the plaintiff must prove the cause of action. It is not sufficient merely to show that the defendant prior to the marriage was afflicted with a mental disorder. There must be, as well, proof of fraudulent suppression which implies knowledge of the impediment. The plaintiff's testimony must be corroborated as in other cases. 11 N.J. Practice (Herr, Marriage, Divorce & Separation), sec. 952; Crane v. Crane, supra.
The inference which plaintiff would have this court adopt from the circumstances of the institutionalization and the medical reports does not establish defendant's guilty suppression.
Allen v. Allen, 85 N.J. Eq. 55 (Ch. 1915), affirmed 86 N.J. Eq. 441 (E. & A. 1916), dealt with a situation in which the defendant husband, a physician, failed to disclose to the plaintiff that he was tainted with hereditary insanity. The plaintiff became aware of this fact after the husband performed an abortion on her without her knowledge, apparently to prevent the possible inheritance of this condition. At the time of the suit the defendant had become insane. The court below held that the relief must be denied for want of adequate proof of the fact that defendant was at the time of his marriage afflicted with a taint of insanity which would have been inherited by his *590 offspring. The then Court of Errors and Appeals affirmed, stating that the bill was properly dismissed for the failure of proof to support the allegations of her bill. The court found it unnecessary to consider the interesting question discussed by the learned vice-chancellor, viz., whether the fact that one of the parties to a marriage is insane at the time when the marriage takes place  in the instant case defendant had the capacity to consent to the marriage  and intentionally conceals the fact from the other party to the marriage affords just ground for its annulment.
Nevertheless, the language of former Vice-Chancellor Leaming is worthy of repetition.
"Misrepresentation as to freedom from disease in general or concealment of the existence of a disease, although one in common apprehension, communicable and transmissible to offspring, cannot, in my judgment, be so regarded. They fall within the line of false representations as to family, fortune or external conditions, declared by Mr. Justice Bedle, [in Carris v. Carris, supra] to be insufficient to justify the annulment of marriage. As to such and like matters the parties take each other for better or for worse. 1 Bishop Mar., D. & S. sec. 459."
"I think it will be found that, in the absence of statutes specifically authorizing a decree of annulment, or declaring the marriage unlawful at the time it was contracted, no satisfactory authority exists to support the view that a marriage contract, voidable only, can be annulled by a court of equity for fraudulent concealment by a party touching his or her physical condition, except in the extreme instances already referred to of disease of either party of a nature to render contact seriously dangerous to the other or pregnancy of the wife. The importance of healthful offspring cannot be over-estimated but that consideration appropriately belongs to the Legislature."
In the case under consideration defendant made no representations as to her mental condition.
The holding in Buechler v. Simon, supra, on the point in question was cited with approval in Storf v. Papalia, 24 N.J. Misc. 145 (Ch. 1946).
As before stated, a court should not annul a marriage on the ground of fraud except in extreme cases, where the particular fraud goes to the very essence of the marriage *591 relation, especially is this true where, as here, the marriage has been consummated and the parties have assumed all the mutual rights and duties of the relation. Consideration of public policy intervene and our courts are loath to annul a marriage.
"It creates a status which society is interested in maintaining. Marshall v. Marshall, 1931, 212 Cal. 736, 300 P. 816, 75 A.L.R. 661. `In that contract of marriage which forms the gateway to the status of marriage, the parties take each other for better, for worse, for richer, for poorer, to cherish each other in sickness and in health. Consequently, a mistake, whether resulting from accident, or in general fraudulent practices, in respect to character, fortune, health, or the like, does not render void what is done. A man who means to act upon such representations should verify them by his own inquiries. The law presumes that he uses due caution in a matter in which his happiness for life is so materially involved, and it makes no provision for the relief of a blind credulity, however it may have been produced.' Schouler on Domestic Relations, sec. 23." Rhoades v. Rhoades, supra.
Accepting for the sake of argument plaintiff's contention that defendant was guilty of fraudulent concealment of her prior commitment to an insane asylum  question, does such fraud go to the very essence of the marriage relation?
Mr. Justice Heher in an excellent opinion answers the question in the following manner:
"In an early case holding that the dissolution of the marriage contract for antecedent cause was within the general jurisdiction of equity, this court said of the marriage contract and of the sufficiency of the fraud to warrant such judicial action: `Most serious considerations of public policy and good morals affect it [the marriage contract], and demand that it should be indissoluble, except for the gravest causes. The mere presence of fraud in the contract is not sufficient to dissolve it. The fraud must exist alone in the common law essentials of it, and then not to have the effect of avoiding it against sound consideration of public policy. * * *
Again, in discussing the nature of the fraud which will vitiate the consent essential to a marriage contract, he says: `In that contract of marriage which forms the gateway to the marriage status, the parties take each other for better, for worse, for richer, for poorer, to cherish each other in sickness and in health; consequently a mistake, whether resulting from accident, or, in general, *592 from fraudulent practices, in respect to the character, fortune, health, or the like, does not render void what is done.' Ibid. sec. 459. These he regarded as in the category of `error accidentalis,' and therefore inadequate."
Justice Heher was quoting from 1 Bishop on Marriage, Divorce and Separation, supra, sec. 459.
"The nature of marriage forbids its validity to rest on any stipulations concerning these accidental qualities. Should the man, in words, agree with the woman to be her husband only on condition of her being so rich, so virtuous, so wise, so healthy, of such a standing in society; yet, should he then celebrate the nuptials on her representing herself to possess those qualities, while in truth she did not; still in the act of marriage he says to her, in effect and in law, `I take you to be my wife whether you have the qualities or not, and whether you have deceived me or not.' In other words, he waives the condition. To carry such a condition into the marital relation would violate its spirit and purpose, and be contrary to good morals. The objects of marriage, rightly understood, transcend all considerations of the kind. * * * Here the law regulating the executed contract of present marriage differs from that governing the agreement of future marriage; for, in the latter, the parties to it so far stipulate concerning the accidentals as to enable either to avoid the contract where any fraud as to them has been discovered. To hold otherwise of fraud in present marriage would degrade a high and holy relation to the level of things of mere mercantile consideration."
Mr. Justice Heher was quoting from sec. 460 of 1 Bishop on Marriage, Divorce and Separation:
"`* * * Therefore no misconception as to the character, fortune, health or temper, however brought about, will support an allegation of fraud on which a dissolution of the marriage contract, when once executed, can be obtained in a court of justice. These are accidental qualities, which do not constitute the essential and material elements on which the marriage relation rests. The law, in the exercise of a wise and sound policy, seeks to render the contract of marriage, when once executed, as far as possible indissoluble. The great object of marriage in a civilized and Christian community is to secure the existence and permanence of the family relation, and to insure the legitimacy of offspring. It would tend to defeat this object, if error or disappointment in personal qualities or character was allowed to be the basis of proceedings on which to found a dissolution of the marriage tie.' Reynolds v. Reynolds, 3 Allen, Mass., 605." See Lindquist v. Lindquist, 130 N.J. Eq. at pages 16, 17, 18, 19.
*593 It is apparent that the assumed fraudulent concealment does not go to the essential of the marriage relation.
Throughout the country there is a difference of view as to concealment of mental condition as ground for annulment of marriage. One view is that concealment of insanity or diseased mental condition is not such ground (39 A.L.R. 1345), at least, under certain circumstances, concealment of past insanity, or occasional temporary mental derangement (Lyon v. Lyon, 230 Ill. 366, 82 N.E. 850, 13 L.R.A., N.S., 996, 12 Ann. Cas. 25 (Sup. Ct. 1907); Hamaker v. Hamaker, 18 Ill. 137, 65 Am. Dec. 705 (Sup. Ct. 1856); (an action for divorce)), is not ground for annulment of marriage. The theory of this view is that concealment or misrepresentation with respect to mental condition of one of the parties to a marriage is of the same nature as misrepresentation of social status, temperament, or disposition, and does not go to the essence of the marriage. Furthermore, it is reasoned in support of this view, the law does not guarantee to every husband or wife a rational mental standard for the mind of the other spouse. Hamaker v. Hamaker, supra; see 35 Am. Jur. Marriages, sec. 116, p. 254.
This view is consistent with the declared law of our State which requires that the particular fraud go to the very essence of the marriage relation, especially in consummated marriages.
As proof of fraudulent concealment, plaintiff also alleges that defendant made a false answer in a statement which she signed before the parish priest in answer to the question, "Have you or he ever suffered from any mental disturbance?" and defendant answered "No." No proof was submitted which would in any way indicate that defendant had actual knowledge of the import of the question. This all-inclusive question with all of its medical implications is indeed confusing to the average person, especially to one without any knowledge of the science of medicine or mental illness. The alleged false answer adds nothing to the recognized causes for annulling marriages for fraud.
*594 In any event, plaintiff in this case had ample warning, yet he took no steps to ascertain the truth of the statements made to him by his brother-in-law and mother-in-law nor the doctor to whom he took his wife for an alleged stomach disorder prior to the marriage. He was guilty of blind credulity, from the consequences of which the law will not relieve him. He had knowledge of facts sufficient to put a reasonable man on his inquiry.
Reflecting on the principles thus established and taking cognizance of the proof here submitted, the complaint is dismissed.