HARRY BRAINEN

*v.*

MINNIE BRAINEN.

[Decided February 3d. 1912.]

In a suit to annul a marriage for defendant's incapacity to consent, evidence *held* insufficient to show that she was insane at the time of the marriage.

---

Heard on petition, answer and proofs.

*Mr. Saul Cohn,* for the petitioner.

*Mr. Samuel Koestler,* for the defendant.

EMERY, V. C.

In this case I will state briefly the conclusion reached, leaving a fuller statement and opinion to be filed hereafter, if it seems desirable.

The petition is filed by the husband, Harry Brainen, to annul his marriage to defendant, Minnie Brainen (born Minnie Bloch), on account of the defendant's incapacity to consent—arising from her lunacy at the time of the marriage. It is filed under the *Divorce act, 1907,* § *1, subsec. 4 (P. L. p. 474),* authorizing decrees of nullity of marriage when "the parties or either of them was, at the time of the marriage incapable of consenting thereto, and the marriage has not been subsequently ratified." The marriage occurred at Elizabeth, New Jersey, on

January 16th, 1910, and after the marriage ceremony, the parties went to the husband's residence in Newark, where they lived together until February 28th, 1910, when the wife returned to her father's home in Elizabeth and has since resided there. Between the time of her return and the middle of June, 1910, the petitioner, by personal calls at the house and by letters to the defendant, made efforts to secure her return to live with him. He subsequently ascertained that several years before the marriage and in the year 1904, his wife had been an inmate of a sanitarium at Summit, New Jersey, under treatment, as the petition says, "for nervousness and melancholia." The petition for annulment was filed August 12th, 1910. The suit is defended by the defendant in her own person and she has attended the trial (lasting four days, three of them successive) and was herself for over three hours examined and cross-examined at length. There is no question as to her mental competency to defend the suit for herself, including ability to advise with and assist counsel intelligently and also the ability to recall those incidents connected with the marriage ceremony and subsequent incidents at her husband's home, which are relied on by petitioner to establish insanity, nor as to her ability to give her counter statements as to those incidents.

The defendant was under treatment in 1904 in a sanitarium and Dr. Prout, the physician in charge, who is now called as the petitioner's expert, described the patient as then suffering from a mild form of dementia præcox—a derangement accompanying adolescence. The sysptoms of this disease, or some of them, are such as are often shown in types of melancholia. After a treatment of about three months, she left the sanitarium to return home, and was discharged improved. The physician says that she had then apparently lost a great many of the symptoms presented when she first came, but still had some of what the physician calls the "stereotyped expressions" of the disease. There are, he says, cases of complete recovery from this disease, and the percentage of partial recovery, where the patient is capable of assuming more or less of the duties of life, is, he says, perhaps as high as twenty-five. From the time of Miss Bloch's return to her parent's home in the fall of 1904,

up to the day of the marriage, she seems to have been entirely normal in her actions, speech and behavior, which never seem to have given rise to any question as to her mental condition. This is the effect of the evidence produced by the defendant, and the petitioner on his part submits no evidence in contradiction, but for establishing mental disease at the time of the marriage, relies wholly on the inferences to be drawn from incidents sworn to by witnesses produced by him, as to the defendant's actions and behavior on the day of the marriage ceremony, and subsequently thereto, up to the time of separation, in connection with the admitted derangement in 1904. And as to the proper inference to be so drawn, the case rests mainly, if not altogether, on the expert opinion of Dr. Prout. His opinion is that the incidents sworn to by petitioner's witnesses, if substantially true, taken in connection with her condition in 1904, show that the defendant's entering into the marriage contract and the marital relation had brought about a recurrence of the original disease, and the incidents sworn to as occurring on the day and in connection with the preparation for the marriage and the ceremony or contract, taken in connection with the subsequent events, show that she had not fully recovered from the disease at the time of the marriage. On these facts he further gives his opinion that defendant was insane at the time of the marriage and did not understand the nature and quality of the marriage contract. This expert opinion, however, must be considered in connection with the witness's statement, that in determining sanity, or a recovery from the disease, at the time of the marriage contract, there must be taken into consideration all of the circumstances that follow after the marriage and the patient's reaction under those circumstances. Later, and on redirect examination, Dr. Prout says, that the circumstances incident to the preparation for the ceremony might have induced a return of the malady, and that in his opinion they did, "because the evidence is of that character that she was already in that state." Taking all his evidence, this expert's opinion on defendant's sanity or the existence of the disease at the time of the marriage ceremony, must, I think, be fairly considered as so based on, or colored by, his consideration of the subsequent conditions

arising out of the completion of the marriage relation itself, that it cannot be taken as controlling the court in the decision of the vital and somewhat narrow question in the case, whether at the time of the marriage contract the defendant's mind was so impaired by disease that she was not capable of entering into the contract. This is the period to which the legal inquiry is confined. *Kern* v. *Kern* (*Vice-Chancellor Green, 1893*), *51 N. J. Eq.* (*6 Dick.*) *574, 586.* In this case the incapacity alleged was mental disease as well as imbecility. *Cannon* v. *Smalley* (*1894*), *10 Prob. Div. 96, 98.* This was a case of alleged mental disease. The fact that circumstances subsequent to the marriage and arising even out of the marriage relation itself, brought about a recurrence of the disease, would not justify the annulment of the marriage.

If the petitioner's evidence be taken as substantially true, it may, in connection with the evidence of the expert, be taken as perhaps establishing that at the time of the marriage contract, a tendency to a recurrence of the disease existed, and that there were some symptoms indicating the danger of such return. A marriage of a patient who has been previously insane from disease cannot be invalidated merely by reason of a tendency, or liability to recurrence.

Such tendency may be a sufficient medical reason why persons subject thereto should not marry, and Dr. Prout's own evidence on this point is,

"that any patient that has recovered from this form of mental disease, and in which there is any future impairment of judgment, should never marry, because marriage will really be visited with disaster."

This statement shows, I think, the aspect in which he regards the question of mental capacity at the time of the contract, and that it is the medical rather than the legal aspect. The difference between the two standpoints is emphasized by Vice-Chancellor Green in *Kern* v. *Kern, supra* (at *p. 586*).

The circumstances previous to and in connection with the marriage ceremony, relied on by the petitioner as establishing the existence of disease at that time, to the extent of incapacitating defendant from entering into the contract, relate mainly

18

to the behavior of defendant toward her own father, and, as is insisted, show delusions as to him then existing. Evidence offered by defendant denies these incidents, or modifies their effect on the point at issue, by showing that the marriage was brought about by a professional matchmaker (a method not unusual among Hebrews of the station and manner of life of these parties), and was entered into by the daughter rather from a sense of duty to her father than from love to her proposed husband. The behavior to the father, if it occurred as stated by petitioner's witnesses, would under the whole circumstances inducing the marriage, be considered rather as indicating resentment against the father because of the relations in which she was to enter, rather than as indicating any morbid delusion about the nature of the relation or of the nature of the contract itself.