The petition is for the annulment of a marriage. The defendant suffered a nervous breakdown in 1906 and was confined to an insane asylum for seven months. She married in June of 1925. Six months later she was threatened with another breakdown and while under treatment in a sanitarium the petitioner learned of her earlier experience, abandoned her and brought this suit. The charge is that the defendant since 1906 has suffered from a mental disorder, a taint of insanity, manifested by nervous breakdowns, and that she fraudulently concealed from the petitioner her affliction as well as her incarceration; and further, that the marriage was performed without physicians' certificate that she had been cured and that her affliction probably was not transmissible to issue.
At the time of the marriage the petitioner was a widower with adult children; the defendant, a spinster of fifty. The defendant is of more than usual intelligence, well schooled, and worked as a stenographer from girlhood until thirty, when she broke down and was committed to the State Hospital at Morris Plains. Seven months later she was discharged as cured. She apparently was strong of body and healthy of mind until the attack, and after convalescence appeared well and normal, physically and mentally, until after her marriage twenty years later. As a witness she had poise, was alert and of pleasing personality. She was sane when she married and sane lifelong, interrupted only by the breakdown in 1906. The threatened second interruption in 1926 was averted in its approach by timely treatment. This was at the menopause and perhaps attributable to that and her changed domestic condition and the worries of the new household. Her case was diagnosed at the time (1906) as adolescent insanity, dementia precox, a persistent and progressive disorder, but the diagnosis is admitted to have been erroneous. The diagnosis now is manic depressive insanity, described as an hereditary instability of the nervous system which predisposes the subject to attacks of derangement *Page 574 
under heavy mental pressure or strain. It is said that the infirmity is functional and that the point of collapse varies with the degree of instability or the intensity of the strain. The medical world regards it as a pathological disorder transmissible to issue through the germ plasm; that the condition is constant but that the attacks submit to treatment and are curable, convalescence progressing as the load is removed; that the paroxysms manifest the presence of the disease and mark the periods of aberration and that the attacks are recurrent and, cumulatively, result in mental deterioration. The diagnosis is usually confirmed if the family history of the patient discloses a relative, near or remote, similarly afflicted, as in this case, an insane aunt. So ran the testimony of the profession, and from which may be deduced that one not constitutionally sturdy in his nervous make-up may be a subject and a medium and yet not a victim of the disease if he suffers no undue strain, though he live the full span; and so with the horde that has gone its journey and those who are still going, outside the madhouse; all potentially insane if we accept the scientific definition. However that may be, the decision does not turn on the question of the defendant's mental health, for the gravamen of the petition is not that she was insane for a spell before her marriage and that she has ever since suffered from a disorder from which she may again lapse into insanity, but that she fraudulently concealed her condition. The jurisdiction to relieve for fraud and the petitioner's right to relief must be found in deceitful suppression of the truth. The suppression must have been willful, with intent to deceive. The equitable acceptation of fraud, that a harmful untruth though innocently uttered is fraudulent, as explained in Cowley v. Smyth, 46 N.J. Law 380, is not pertinent, for the defendant made no representation. Silence, resting in honest belief of things false, is not actionable at law or in equity. All the cited cases of annulment rest on deceit. Carris v. Carris, 24 N.J. Eq. 516; Crane v.Crane, 62 N.J. Eq. 21; Allen v. Allen, 85 N.J. Eq. 55; Davis
v. Davis, 90 N.J. Eq. 158; Bolmer *Page 575 
v. Edsall, 90 N.J. Eq. 299; Ysern v. Horter, 91 N.J. Eq. 189;Dooley v. Dooley, 93 N.J. Eq. 22; Steerman v. Snow, 94 N.J. Eq. 9; Daniels v. Margulies, 95 N.J. Eq. 9; Gruber v. Gruber,98 N.J. Eq. 1.
In Kaufman v. Kaufman, 86 N.J. Eq. 132, Vice-Chancellor Foster refused an annulment in a case of incipient syphilis whose presence was unknown at the time of the marriage, perhaps an innocent infection (on the lip), because there was no deception, following the Crane Case.
The proof is that the defendant did not resort to deceitful inducement to the marriage contract. She was not aware that the nervous breakdown in her youth was an attack of insanity, if it was. The underlying malady was unknown to her, and the breakdown, not an uncommon mishap, was not regarded by her, nor is it by the layman, as a disease or the result of disease. We usually lay it to overwork or shock. Her commitment to an asylum was a misfortune of the day. To-day she would be taken to a sanitarium, an institution of similar service without the odium. She went to an asylum protestingly, because of the ignomy, upon the advice of her physician that she needed hospital treatment for what she regarded as a case of shattered nerves. Her breakdown was free from delusion or hallucination, and she says she was conscious of her conduct and recalls it. This experience, twenty years later, was an unpleasant memory but nothing to chide her, as she understood. To her the breakdown was an episode and the commitment an accidental tragedy in the drama of life which she had long since put aside without thought or suspicion of recurrence. She did not simulate health, she felt it. Repressing the unhappy event or failing to recount it to the petitioner was not a conscious concealment; it was not design; she did not dissemble; nor was it a concealment recognized in law as fraud, for, in the circumstances, she was not in duty bound to speak of an illness which she had survived without imprint or impairment as she believed. The authorities are not harmonious on the question of guilty concealment of mental *Page 576 
disease and consequent attacks of insanity as ground for annulment, but they are of one opinion, that there must be a guilty suppression of the affliction. Many of the cases are collected in Robertson v. Roth, 39 A.L.R. (Minn.) 1342, and annotations. The cases of annulment in this state are all predicated upon willful misrepresentation or intentional suppression. The remark of Vice-Chancellor Emery in Brainen v.Brainen, 79 N.J. Eq. 270, that a mental disease with recurring attacks of insanity would not justify annulment for incapacity, is comprehensive and of some significance.
Concealment of incarceration in a lunatic asylum, standing alone, is not a ground for annulment. It does not touch the marriage essentials and falls within the line of false representation as to family, fortune or external conditions, and as to these the parties take each other for better or for worse, as declared in the Carris Case. But the contention goes deeper; that the ordeal put the defendant on notice that she had been insane of a mental disorder that again may result in insanity, and hence the suppression of the commitment was a fraud. The point lacks substance and has already been met. The defendant knew, of course, she had been in an asylum, but she also knew or understood that she had been there not for restraint but for treatment for a nervous breakdown from which she had recovered and was sent away cured.
An affliction of the nervous system, of hereditary influence, predisposing to insanity, is not itself a fraud and ground for annulling a marriage, "unless," as observed in one of the cases, "the law guarantees to every husband a rational mental standard for the mind of a wife." To propound as a doctrine of law that it is a fraud would render vulnerable every marriage to a spouse inheriting a frail nervous system of the manic depressive type, and the number is not inconsiderable, or one of potential paretic inheritance to the fourth generation of syphilitic infection, or one the subject of any other heritable disorder that may eventually lead to insanity. Such departure from accepted principles governing the marriage relation is for legislative, not judicial, consideration. *Page 577 
Section 105c of the Crimes act (Comp. Stat. p. 1778) provides that:
"It shall be unlawful hereafter for any person who has been confined in any public asylum or institution as an epileptic, or insane or feeble-minded patient, to intermarry in this state, without a certificate from two regularly licensed physicians of this state that such person has been completely cured of such insanity, epilepsy or feeble mind, and that there is no probability that such person will transmit any of said defects or disabilities to the issue of such marriage; any person of sound mind who shall intermarry with any such epileptic, insane or feeble-minded person, with knowledge of his or her disability, or who shall advise, aid, abet, cause or assist in procuring any marriage contrary to the provisions of this act, shall be guilty of a misdemeanor."
And the Marriage act (Cum. Supp. Comp. Stat. p. 1828) provides inter alia that:
"No license to marry shall be issued when either of the contracting parties, at the time of the application * * * is or has been an inmate of any insane asylum or institution for indigent persons, unless it appears that such person has been satisfactorily discharged from such asylum or institution."
These police regulations do not affect the legality of forbidden marriages. A certificate is not a condition precedent to their lawfulness. The argument is, in effect, that these statutory requirements put the defendant on notice to give notice to the petitioner; but she did not know of the law. She is, of course, chargeable with constructive notice of the law and could not plead ignorance upon prosecution for a violation, but as to the petitioner the rule of constructive notice does not apply. She owed him no duty of compliance. If she had actual knowledge of the law an unfavorable inference might arise. The statutes add nothing to the commonly recognized grounds for annulling marriage contracts for fraud, as in Gould v. Gould. 78 Conn. 242.
The prayer of the petition will be denied and a decree will be advised for separate maintenance to the defendant. *Page 578