HERMAN STORF, petitioner,

*v.*

JOSEPHINE ROSE PAPALIA, otherwise JOSEPHINE ROSE STORF, defendant.

[Decided May 3d, 1946.]

*Mr. Frank G. Schlosser,* for the petitioner.

*Mr. Jack Prizzia,* for the defendant.

VAN WINKLE, A. M.

The parties, who apparently were then domiciled in New Jersey, were married on May 11th, 1935, in New York City, by a deputy city clerk. In answering one of the questions on the application for the license, defendant declared that there was "no legal impediment" to her marrying. The fact is that the defendant had been theretofore twice confined at the New Jersey State Hospital, Greystone Park. The parties lived in New Jersey as husband and wife till October or November, 1940, when the defendant was again committed

to an asylum for the insane, this time to the Hudson County Mental Diseases Hospital at Laurel Hill, where she still is.

Petitioner avers that the defendant was mentally incapacitated to marry at the time that she was married to him and that he had no knowledge that she was so incapable, nor that she had been twice confined as an insane person, until he casually was put on suspicion after the defendant was again committed in 1940, when his solicitor's investigations in 1943 disclosed the previous confinements. Now, it appearing to him that the defendant is to continue in confinement apparently permanently, he brings his suit to annul the marriage.

The petition contains three causes of action; and the statement of counsel for the petitioner is that "all are grounded upon the general equity jurisdiction of the court, and that cause 1, in addition, is also based upon our annulment statute *R. S.* 2:50–1; *N. J. S. A.* 2:50–1," which reads as follows:

"Decrees of nullity of marriage may be rendered in all cases, where: * * * (d) the parties or either of them were at the time of marriage incapable of consenting thereto and the marriage has not been subsequently ratified, provided that where the party capable of consent is the applicant such party shall have been ignorant of the other's incapacity at the time of the marriage and shall not have confirmed the marriage subsequently to the regaining of capacity by the other party."

This statute, however, does not apply, for the marriage was made in New York, and its validity is to be determined by the law of New York. While the validity of the marriage is to be determined by the law of New York, as of the time of the marriage, no pertinent law of New York was pleaded nor was there any proof of any such law, nor was any pertinent New York statute or law called to my attention. So the presumption will be indulged (on the basis of the New Jersey decisions, which may be found referred to in *Kelly* v. *Kelly,* 134 *N. J. Eq.* 316 (at *p.* 319); 35 *Atl. Rep.* (2*d*) 618 (1944); that common law principles prevailed in New York at the time of the marriage in 1935. See *Restatement, Conflict of Laws,* ¶ 136, Law Governing Nullity and comment thereunder.

Counsel for the petitioner contends that because of the insanity of the defendant at the time of the marriage, the

marriage is void, and so petitioner is entitled to a nullity decree independently of any statute or other considerations.

An attempt to firmly define or to adequately classify "void" marriages and "voidable" marriages in such a way that inevitable legal consequences follow, does not help us in the decision of this suit. The pages in the Bishop and Schouler textbooks where there are discussions of classification make unsatisfactory reading. And the difficulty and the fruitlessness of such discussions are somewhat referred to by Mr. Justice Heher in *Lindquist* v. *Lindquist,* 130 *N. J. Eq.* 11; 20 *Atl. Rep.* (2d) 325 (1941).

While our annulment statute as to incapacity does not apply in this suit, I think, however, that a petitioner seeking a nullity decree for incapacity under the general equity jurisdiction of this court needs to prove to the same extent at least that he would be called upon to prove if the statute did apply. In short, even if a marriage may be classified as "void" a petitioner, the competent party to the marriage, may have acted with respect to the facts, or with relation to the incompetent party, or to the marriage, in such a way that any right to a nullity decree that he might abstractedly have would be canceled.

For example, if he had knowledge of the insanity at the time of the marriage, or if thereafter, on acquiring knowledge, he ratified or confirmed the marriage by continuing to live as a husband with the insane wife, he is not to have a nullity decree. His coming into court with unclean hands or an application of the doctrine of estoppel may lead to a refusal of a decree. (See *Tyll* v. *Keller, 94 N. J. Eq.* 426; 120 *Atl. Rep.* 6 (1922), in which case our Court of Errors and Appeals was deciding respecting a marriage characterized by Chief-Justice Gummere as a "void" marriage; and the doctrine of which case has not since been departed from in any way.)

Dr. Collins, alienist, clinical director of the New Jersey State Hospital, Greystone Park, examined the defendant, then nineteen years old, when she was first admitted to the hospital on January 3d, 1927. His diagnosis then was "manic depressive and potentially a dementia praecox case;" and he examined her again on her readmission to the hospital on June 30th, 1932, when his diagnosis was "dementia praecox hebephrenic type." The defendant was paroled on November

26th, 1934, as "improved." Being paroled meant that she was "placed in the custody of some responsible person" and kept "under supervision" by means of "the hospital's social service department, all young girls, college graduates, who were to visit the patient and watch how she was adjusting herself to her outside surroundings." Dr. Collins testified that at the time of the marriage the defendant was afflicted with "a chronic progressive mental disease," that "while she would be aware of what she was doing in getting married on May 11th, 1935, she did not then have the mental capacity to appreciate the nature of the marriage contract."

On the question of knowledge by the petitioner of the insanity of the defendant at the time of the marriage—the petitioner testified that the defendant's father and her brother-in-law "beat him up" while he was walking on the street with the defendant a short time before the marriage. He said he knew no reason for the beating. "They says to me 'stay away from her' that was all was said, they told me they did not want me to go out with her;" and he testified further, "The next night the defendant told me gee, that is the way they beat me up, I says 'that is all right Josephine,' she came told my mother, my mother even said 'Gee, feel sorry for the poor girl.'" This mother died some time ago.

The version of the defendant's father concerning this episode was different. This father, a somewhat excitable witness without much command of the English language, testified in effect that he and the defendant's brother-in-law, and apparently with others, encountered the defendant and the petitioner on the street when the father, who considered the petitioner unfit to marry, shouted out to the petitioner that the defendant had been "two time institution insane." Apparently there were "a lot of people" on the street at the time and there was a "yell" and apparently the petitioner and the defendant either or both, ran away, and there was a pursuit. Nobody testified respecting this occurrence except the petitioner and the father. It is not clear whether the defendant's mother was present. However, the brother-in-law referred to, and also the mother of the defendant, who apparently could have testified on other matters, were not called as witnesses for the defendant.

A trial judge in this court, acting as a finder of facts, has the same rights as a jury to give significance to the failure of a party to call an available witness who would normally be a witness for such party. (See *Robinson* v. *Equitable Life Assurance Society,* 126 *N. J. Eq.* 242 (at *p.* 247); 8 *Atl. Rep. (2d)* 600 (1939); also *Breheny* v. *Essex Co.,* 134 *N. J. L.* 129; 45 *Atl. Rep. (2d)* 700 (1946).

The petitioner is a laborer. The application for the license to marry discloses that the petitioner stated therein that he was a "coal carrier." The defendant's brother testified that the petitioner "was not welcome in the family;" and he added, "I do not believe he was my sister's equal because he was a drunkard, had a bad reputation." In this testimony we may find a reason why the petitioner was "beat up" with no relation to the insanity or previous commitments of the defendant. It does not appear that the father of the defendant or the brother-in-law followed up in any way with any more information given to the petitioner of the defendant's insanity or her confinements. It may be that they felt in the period after the marriage that not only had the defendant "improved" but also that she had recovered.

On the question of ratification—it being clear that the defendant is not to be held as guilty of false representations inducing the marriage—we may say that the evidence given for the defendant to show a ratification or confirming by the petitioner of the marriage was given on an assumption that the defendant lacked capacity at the time of the marriage, or on an assumption that when all the evidence should be in such lack would have been established. Otherwise the question of ratification would not need to be considered.

The ratification evidence so called, came from the defendant's brother, who testified that some months after the marriage the petitioner "who was quite handy doing odds and ends" around the brother's home, was there, as he had been "pretty regularly" to "help me out on my afternoons off;" and this brother testified further in part as follows: "While he was in the backyard fixing lawn one day and my sister and my wife were in the kitchen I went outside spoke to him; so I said to him 'Now Herman you finally got married against our objections so I says you know the girl has been sick and she was committed at Greystone Park institution and he says

'Well that is bygones is bygones I do not care, I love my wife, going to stick by her;' so I just told him to be careful how you treat her, otherwise one little incident that she might not like may cause her to get another breakdown and he says 'All right I will be as careful, as good as I can to her.' "

The petitioner's testimony was that he had never heard of the defendant's confinements in Greystone Park until after she was committed in 1940 except casually and as hereinafter referred to. However, if we should accept the testimony of the defendant's brother as true it appears that no comparatively full revelation of the defendant's condition was made by the brother. Telling the petitioner that the defendant had been "sick," and warning against another "breakdown" was not telling the petitioner that at the time of the marriage the petitioner was afflicted with a "chronic and progressive mental disease" or that she was then on parole from Greystone Park under supervision. Probably, although the defendant's father and brother and brother-in-law all thought that the defendant was "not fit to get married," because of her mental condition, they had no precise knowledge of the nature of her affliction. Constantly, we have wives testifying in matrimonial causes that they have had "nervous breakdowns." Ordinarily a "breakdown" does not connote insanity of the kind with which Dr. Collins testified that the defendant was afflicted at the time of the marriage.

The petitioner testified that the first time he heard of the defendant's previous confinements was a year or so after the marriage when the defendant and her sister had an argument and the sister said "Herman you do not know but Josephine was in Greystone Park already." The petitioner testified "I was supposed to go up Thanksgiving Day in house and defendant's brother told me why did not go up, says 'Oh do not mind her, she is silly herself' " (referring to the sister, Mrs. Matzig) "after that the same Mrs. Vera Matzig went out to Greystone Park herself." While the brother testified that he did not say of defendant's sister "Oh do not mind her she is silly herself," he did testify that the petitioner told him that the sister had said this. The brother testified that he himself said, "I told him I was not interested at the time what my sister had said, that I was only interested in his coming for dinner the way he had promised to come." Whether or not

the brother so intended, it appears that he brushed aside the effect of the sister's statement on the petitioner. In what the brother testified he said to the petitioner there was evasion or concealment rather than revelation.

Counsel for the petitioner contends that the defendant was guilty of fraud in concealing the fact that she had previously been confined as insane, in concealing her insanity, in stating in the application for the license to marry that there was "no legal impediment" to her marrying; and he cites the New Jersey statute (*R. S.* 37:1–9; *N. J. S. A.* 37:1–9) which prohibits "the issuance of a license to marry to a person who is or has been an inmate of an insane asylum * * * unless it appears that such person has been satisfactorily discharged therefrom." As to this contention we have no proof that New York had a similar statute at the time of the marriage; and even if there had been such proof it should be held that such a statute is but a police regulation, not affecting the validity of the marriage. See *Buechler* v. *Simon,* 104 *N. J. Eq.* 572 (at *p.* 577); 146 *Atl. Rep.* 420 (1929). Moreover, it should be said that concealment of previous incarceration in a lunatic asylum, standing alone, is not a ground for annulment, *Ibid.*

When a contention is made that a party to a contract of marriage was incapable to contract because of insanity and also that such person was guilty of fraud by false representations or suppression of fact which induced the marriage, the question at once arises: Is such person capable of making representations or suppressing in such a way as to be responsible? We notice that the Chancellor in *Daniele* v. *Margulie,* 95 *N. J. Eq.* 9; 121 *Atl. Rep.* 772 (1923), had this thought; and Vice-Chancellor Backes in the nullity suit of *Buechler* v. *Simon, supra,* held that to succeed for fraud a party needs to show a guilty suppression; and he found that all the cases of annulment for fraud rest on *deceit.*

I determine that the petitioner is not entitled to a nullity decree for fraud. However, I determine that the defendant lacked mental capacity to marry on May 11th, 1935; that the petitioner was then ignorant of such lack; and further that the petitioner did not ratify or confirm the marriage after knowledge of such lack; and I will advise a decree of nullity on these grounds.