JOSEPH DACUNZO, PLAINTIFF-RESPONDENT, v. ELEANOR EDGYE, FALSELY CALLED ELEANOR DACUNZO, DEFENDANT-APPELLANT.

Argued September 7 and 12, 1955—Decided October 10, 1955.

444

*Mr. Irving Siegler* argued the cause for the appellant (*Messrs. Siegler & Siegler*, attorneys; *Mr. Harvey Schwartzberg* on the brief).

*Mr. Leonard Estrin* argued the cause for the respondent (*Mr. Frederic W. Athay*, attorney).

The opinion of the court was delivered by

OLIPHANT, J.   This is an appeal from a judgment of the Appellate Division of the Superior Court affirming a judgment of the Superior Court, Chancery Division, in an action for annulment brought by the respondent in which the appellant counterclaimed for separate maintenance for herself and two children of the marriage.

Certification was granted in this case under *R. R.* 1:10–2(*d*) since the Appellate Division had decided an important question of law which has not been, but should be settled by this court.

The parties were ceremonially married in New Jersey on June 24, 1945, and have resided here ever since.   They cohabited and held themselves out as husband and wife from the date of the marriage until February 10, 1952, when they separated.   Two children of the marriage have been in the appellant's custody ever since.   The parties met in 1944 and discussed marriage in the early spring of 1945, and in May 1945 they and their respective mothers appeared before a Catholic priest in Newark at which time the appellant informed the priest she was single and had never been married.

When she applied for her marriage license she expressly stated under oath that she was single but left blank the question as to whether she had ever been divorced.

In September 1951, six years after the marriage, the appellant informed the respondent that she had been married before and divorced. An investigation finally disclosed that the appellant had married one Byrne in 1935; that Byrne had sued for divorce on the ground of adultery and secured a decree *nisi* awarding him custody of their three children, and the appellant had seen the children only once since then. The decree *nisi* was entered on April 25, 1945 and the said decree did not become final until July 26, 1945, which was one month and two days after the date of the appellant's marriage with the respondent here, June 24, 1945.

The trial court found as a fact that the appellant had, before her marriage, held herself out as a single woman who had never been married and that the respondent believed her representations, and further that the first definite information the respondent had of the prior divorce was when his attorney gave him the results of an investigation early in 1953, and that the appellant had concealed from the respondent her prior marriage and he never learned until a year and a half after he left appellant on February 10, 1952 that she had a husband living when he married her.

We have reviewed the record in this case, as did the Appellate Division, and after giving due regard to the opportunity of the trial court to judge the credibility of the witnesses we concur in the finding of fact made by the lower two tribunals. *R. R.* 1:5–3 (*a*). The Appellate Division likewise concurred in the conclusion of the trial court as a matter of law that (1) the ceremonial marriage between the parties was and is void; (2) there was not and could not be a common law marriage, notwithstanding the fact that they went through a ceremonial marriage, resided together as husband and wife for some years and children were born of the marriage, because *L.* 1939, *c.* 227, *N. J. S. A.* 37:1–10, abolished common law marriages in this State; (3) that under *R. S.* 9:15–2 the infant children of the marriage are legitimate even

though the ceremonial marriage of the parents be annulled; (4) that under the proofs the plaintiff was not estopped by his conduct, nor should relief be denied him because he came into equity with unclean hands; (5) giving due weight to the provisions of *N. J. S.* 2A:34–1, a judgment of nullity would not be against the best interests of the children of the marriage.

A judgment *nisi* was entered on May 27, 1954, dismissing the appellant's counterclaim and the ceremonial marriage entered into on June 24, 1945 was declared a nullity; the judgment of nullity was held not to be against the interests of the children of the marriage since *R. S.* 9:15–2 declared them legitimate notwithstanding the annulment of the marriage, and custody of the children was awarded to appellant and respondent was directed to pay the appellant $15 per week for the support and maintenance of each of them.

The questions here presented which call for decision by this court are:

1. Does *N. J. S. A.* 37:1–10 abolish all common law marriages occurring subsequent to December 1, 1939?

2. Does *N. J. S. A.* 37:1–10 apply to a case where the requirements of a license and ceremony are met but an impediment existed which was later removed?

The Appellate Division, in an able opinion by Judge Goldmann, held that the statute in question abolished and denied recognition to any common law marriages and that it did apply where the impediment was subsequently removed and made the marriage void absolutely for all purposes.

The statute, *L.* 1939, *c.* 227, *N. J. S. A.* 37:1–10 provides:

"Nothing in this chapter shall be deemed or taken to render any common law or other marriage, otherwise lawful, contracted before December first, nineteen hundred and thirty-nine, invalid by reason of the failure to take out a license as herein provided. But no marriage contracted on and after December first, nineteen hundred and thirty-nine, shall be valid unless the contracting parties shall have obtained a marriage license as required by section 37:1–2 of this Title, and unless, also, the marriage, after license duly issued therefor, shall have been performed by or before any person, religious

society, institution or organization authorized by section 37:1–13 of this Title to solemnize marriages; *and failure in any case to comply with both prerequisites aforesaid, which shall always be construed as mandatory, and not merely directory, shall render the purported marriage absolutely void.*" (Italics supplied.)

It is conceded on this appeal that the judgment *nisi* in the Byrne divorce proceeding did not terminate appellant's prior marriage. This necessarily had to be conceded since such a judgment under our statute is a conditional judgment of divorce and the marital status remains in full vigor until the expiration of the three-month period and the entering of the final decree. *Grant v. Grant*, 84 *N. J. Eq.* 81, 84 (*Ch.* 1914); *Sobel v. Sobel*, 99 *N. J. Eq.* 376, 378 (*E. & A.* 1926); *Streader v. Streader*, 17 *N. J. Super.* 123, 126 (*App. Div.* 1951). Since the ceremonial marriage here in question was entered into while the appellant's prior marriage was still in full force and effect it was and is a nullity. *Chirelstein v. Chirelstein*, 12 *N. J. Super.* 468, 482 (*App. Div.* 1951).

The appellant argues that at the time of the enactment of this legislation it was a rule of law that where a man and woman, intending to marry, lived together as husband and wife but were frustrated by the existence of some unknown impediment, when such impediment was removed and it was shown the same intendment continued, their relations as husband and wife were lawful from the time such impediment was removed, and this intention related back to the time of the marriage when the impediment existed, and that a common law marriage exists from and after the removal of the impediment. That undoubtedly was the rule in New Jersey. *Chamberlain v. Chamberlain*, 68 *N. J. Eq.* 414, affirmed 68 *N. J. Eq.* 736 (*E. & A.* 1905); *Robinson v. Robinson*, 83 *N. J. Eq.* 150, affirmed 84 *N. J. Eq.* 201 (*E. & A.* 1915); *Dolan v. Wagner*, 96 *N. J. Eq.* 298 (*E. & A.* 1924). This is still the rule as to all marriages occurring prior to December 1, 1939.

This argument is premised upon appellant's contention that *L.* 1939, *c.* 227, did not expressly declare all common

law marriages void, nor specifically those entered into after December 1, 1939, but merely added the requirements of a license and a ceremonial marriage, civil or legal. Such a construction would force the result that once there was a mere *prima facie* compliance with both of these statutory requirements, a continuance of a meretricious relationship would be validated and a bigamous marriage *ipso facto* would become valid, or at least voidable, and would subsist lawfully under the statute.

This would create a far-reaching and fundamental exception to the policy and prohibition of the statute, and we can find no specific language in the statute that would create a firm foundation upon which such an exception would rest. The language of the statute is broad and sweeping and should not be narrowly construed. In unusually peremptory terms the statute renders absolutely void a marriage contracted without a license as required by *R. S.* 37:1–2 *"and unless, also, the marriage, after license duly issued therefor, shall have been performed by or before any person, religious society, institution or organization authorized by section 37:1–13 * * * to solemnize marriages"*; and then it further emphatically declares that *"failure in any case to comply with both prerequisites aforesaid, which shall always be construed as mandatory and not merely directory, shall render the purported marriage absolutely void."* *R. S.* 37:1–10 (Italics supplied).

It would run counter to the policy of the statute, expressed in clear and direct terms, were a void ceremonial marriage to be given validity by mere cohabitation after the removal of the impediment. It is axiomatic that a void act has no validity from the beginning, and this is *a fortiori* true where an act is declared "absolutely void" by a mandatory command of a statute. Such being the case, the validity claimed for the marriage here would come from mere cohabitation, which in our view would run counter to the policy of the statute, since under the statute there can be no common law marriage based upon the application of any of the heretofore recognized common law principles. Thus cohabi-

tation after the removal of the impediment cannot signify the continuance of the matrimonial intention and give rise to a valid marriage coinciding with the removal of the impediment.

While a statute in derogation of the common law is usually strictly construed, *State v. Court of Common Pleas of Mercer County*, 1 *N. J.* 14 (1948), this rule will not be permitted to defeat the Legislature's obvious purpose or lessen the scope plainly intended to be given a statute, *Carlo v. Okonite-Callender Cable Co.*, 3 *N. J.* 253 (1949); *Preziosi v. Buonaccorsi*, 16 *N. J. Super.* 15 (*App. Div.* 1951), and when the intent of the Legislature is clearly and plainly expressed it must be carried out by this court, *Blackman v. Iles*, 4 *N. J.* 82 (1950). The power of our Legislature to make such a change as was made by this statute for the common good, morals and welfare of our people is not open to challenge.

We must construe a statute as written, hence a statute should not be construed to permit its purpose to be defeated by evasion, *Grogan v. DeSapio*, 11 *N. J.* 308 (1953), and we must enforce the legislative will as written and not according to some unexpressed intention, *Hoffman v. Hock*, 8 *N. J.* 397 (1952).

We find in the statute a clear and unequivocal intention to declare all marriages entered into after December 1, 1939, without full compliance with the statute, to be absolutely void, and that necessarily includes all common law marriages which might have been declared valid according to principles of the common law.

The Legislature chose not to enact the exception contended for and, as Judge Goldmann pointed out below, 33 *N. J. Super.* 504, 516 (*App. Div.* 1955), the State of Massachusetts created an exception in the following circumstances:

" 'If a person, during the lifetime of a husband or wife with whom the marriage is in force, enters into a subsequent marriage contract with due legal ceremony and the parties thereto live together thereafter as husband and wife, and such subsequent marriage contract was entered into by *one of the parties in good faith*, in the full

belief \* \* \* that the former marriage had been annulled by a divorce, or without knowledge of such former marriage, they shall, after the impediment to their marriage has been removed by the death or divorce of the other party to the former marriage, if they continue to live together as husband and wife in good faith on the part of *one* of them, be held to have been legally married from and after the removal of such impediment, and the issue of such subsequent marriage shall be considered as the legitimate issue of both parents.' (*Annotated Laws of Mass.*, *Marriage*, c. 207, § 6.)" (Italics supplied.)

We agree with his statement that while there might be social justification for the recognition of some common law marriages, the public policy of this State as manifested in *N. J. S. A.* 37:1–10 must prevail until the Legislature itself sees fit to enact some exception to the statute.

The mischief which this statute sought to ameliorate was of general knowledge. Some persons sought to establish the validity of a meretricious relationship as a common law marriage and thereby claim marital support for themselves and assert such property rights which would vest in them once such a common law marriage was entered into and subsequently legally established. It was because the Legislature was without power to disturb such vested property rights that the statute is expressly prospective from December 1, 1939. Incidental purposes of the statute were to secure the recordation of all marriages and to aid the enforcement of the statute, *R. S.* 37:1–20 *et seq.*, regulating communicable diseases and 'requiring tests and a health certificate as a prerequisite to the issuance of a marriage license.

It was not without reason that our statute and similar statutes in other states have been popularly referred to as "Heart Balm Acts." The many abuses arising from common law marriages, with their effect on public morality, private property rights and the legitimacy of children, called for correction. Our Legislature dealt with such mischiefs in this act in sweeping and emphatic language, permitting no exception or evasion. Time and strict enforcement of the statute and all statutes *in pari materia* relating to the formalities of a marriage ceremony may probably justify the

wisdom of the legislative action, otherwise the Legislature can and probably will make the required changes.

It was suggested below, 33 *N. J. Super.*, at *page* 516, and in *Danes v. Smith*, 30 *N. J. Super.* 292, 298 (*App. Div.* 1954), that certain anomalies result from a holding that our statute, *N. J. S. A.* 37:1–10 renders all common law marriages absolutely void, and that in some specific circumstances this state of the law in effect penalizes virtuous intent and condones immorality. In the *Danes* case Judge Francis made clear the problem that will result. He stated, 30 *N. J. Super.*, at *pages* 298, 299:

"No case has yet been decided in our state courts as to the effect of this enactment on a situation where the parties complied with the formal requisites of license and ceremony in good faith unconscious of an obstacle in the path of a valid marriage, and then continued to live together as man and wife after the removal of the bar. Is the union of these persons void, regardless of their belief and conduct? Has the strong public policy manifested by the statute completely overcome the strong public policy of the common law in favor of recognition of marriage in such cases? Unquestionably the Legislature has the authority to abrogate the common-law doctrine completely if it sees fit to do so.

Strangely enough, a holding that a common-law marriage is barred by the statute in the instance described would bring about a most anomalous situation from a public policy standpoint. When, as here, parties to a ceremonial marriage enter into the relation with knowledge that an impediment exists, they are barred by estoppel or unclean hands from asserting its invalidity, *and their status is unaffected by the statute.* Yet where two persons in good faith undergo a ceremonial marriage unaware of an invalidating obstacle and that obstacle is subsequently removed, continuance of cohabitation matrimonially meant will accomplish nothing for them; their state will still be concubinage. It has been suggested that in such cases there is social and legal justification for the recognition of common-law marriage. *Annual Survey of American Law*, 1952, *p.* 665."

Presumably, if after the discovery and the removal of an impediment to a lawful marriage persons act in good faith, they would of course immediately remarry. But where a man and a woman continue as husband and wife in good faith after the removal of an impediment to their lawful union, without any knowledge of a pre-existing defect, and there-

after are unfortunate enough to be caught in the web of matrimonial discord and then learn of the previously existing impediment, their good faith leaves any innocent party in the subsequent discord without remedy because no marriage exists.

There is nothing new or startling in such result of legislative action. The Legislature is neither omniscient nor prescient, *Bucsi v. Longworth B. & L. Ass'n*, 119 *N. J. L.* 120, 128 (*E. & A.* 1937), and evidence of human fallibility can be found fairly often in enacted statutes and even in decisions of the courts. In the face of a peremptory command of a statute, certain seeming inequities innate in a problem must give way. The wisdom of a statute is not for the courts. *Reingold v. Harper*, 6 *N. J.* 182, 195 (1951); *State v. Monahan*, 15 *N. J.* 34 (1954). The most we can do is to draw attention to the result.

The choice lies between a strict, sweeping statute like the 1939 act, *N. J. S. A.* 37:1–10, and a more lenient statute similar to those above suggested and as adopted in Massachusetts, *supra*, and Virginia, *Virginia Code*, 1950, *Domestic Relations Law, sec.* 20–42, containing controlling doctrines which attempt to meet a problem such as is presented here. This is a problem which is clearly a matter of legislative wisdom and policy.

The appellant contends the doctrine of estoppel should be applied against the plaintiff-respondent. The trial court, who had the opportunity to observe the witnesses and judge their credibility, found a factual basis was not established for the application of this doctrine, and the Appellate Division concurred. We can find no compelling facts or reasons in the record to impel a contrary conclusion.

The ceremonial marriage of the appellant and respondent was concededly a bigamous marriage. By *N. J. S.* 2*A* :92–1 bigamy is a high misdemeanor, which indicates a grave concern of its danger to the public welfare.

The appellant by her willful deceit in failing to disclose her prior marriage and divorce perpetrated a fraud upon the license clerk who had a *quasi*-judicial duty to deter-

mine whether or not a legal impediment to the marriage appeared to exist. *Antunes v. Antunes*, 23 *N. J. Super.* 150, 153 (*Law Div.* 1952); *R. S.* 37:1–8. It should be noted *R. S.* 37:1–8 requires the application in the prescribed form shall be under oath and states: "Any * * * applicant * * * who shall * * * make false answers to any of the inquiries asked by the licensing officer shall be guilty of perjury."

Prior to the enactment of *L.* 1939, *c.* 227, *N. J. S. A.* 37:1–10, the statutory provisions regulating the issuance of a license were mere police regulations and did not affect the legality of forbidden marriages. A license was not a condition precedent to their lawfulness, *Buechler v. Simon*, 104 *N. J. Eq.* 572, 577 (*Ch.* 1929); *Storf v. Papalia*, 24 *N. J. Misc.* 145, 152 (*Ch.* 1946). But the 1939 statute makes a valid issuance of the license and also a prescribed ceremonial marriage as defined by the act, *R. S.* 37:1–13, conditions precedent to a valid marriage, and failure to comply *with both* renders the purported marriage absolutely void.

The statute is mandatory, and based upon the finding of fact made by the trial court, affirmed by the Appellate Division and concurred in by us, that the appellant fraudulently obtained the marriage license, we are enjoined and must declare the issuance of the license to the appellant and her intended husband was fraudulently obtained and void. Therefore the marriage, lacking one of the necessary prerequisites, is not a valid marriege under the statute but absolutely void.

The facts and issues in the present case are such that the doctrine of unclean hands could not have even theoretical application.

Appellant argues the annulment of this marriage is contrary to the best interests of the children. This argument is predicated on the provisions of *N. J. S.* 2A:34–1 which provides, *inter alia*:

"No judgment of nullity shall be made where a child of the parties has been born, either before or after the marriage, or is likely to be born, unless the court upon an examination of all the facts of

the case shall be of the opinion that such judgment will not be against the best interests of the child."

The trial court and the Appellate Division both held that since *R. S.* 9:15-2 legitimatized children born of a ceremonial marriage, the annulment granted in the instant case is not contrary to the best interests of the children. If the contention by the appellant be sustained, then an annulment would not be proper where there were children born of the marriage. The Legislature has not so stated. The appellant argues the depressing psychological factors in an annulment where children are concerned even though they have legitimacy. The Legislature has not laid down any standards and does not make this a determinative test.

A child of a ceremonial marriage, even though bigamous, is likewise legitimate under *N. J. S.* 2A:34-20; that section specifically excepts children of a bigamous nonceremonial marriage and it is only such children who are illegitimate under our law.

The final point of the appellant is that the findings of fact by the trial court were contrary to the weight of the evidence. We have disposed of this contention to the contrary.

We find that the case of *Tegenborg v. Tegenborg,* 26 *N. J. Super.* 467 (*App. Div.* 1953), involving a ceremonial marriage between the parties in Florida, to be distinguishable for the reasons stated by Judge Goldmann below, and we consider the remarks of the Appellate Division in *Danes v. Smith, supra,* as *dicta* in view of the problem before it.

The case of *Tasto v. Tasto,* 4 *N. J. Super.* 547 (*App. Div.* 1949), was decided on the principle of estoppel and the question of the applicability of the 1939 statute was not raised nor did the court consider it, and therefore while it may on its face appear inconsistent with what has been said here the case is distinguishable.

Finally, the appellant calls our attention to *Caruso v. Caruso,* 104 *N. J. Eq.* 588, 593 (*Ch.* 1929), where Chancellor Walker, relying on the predecessor statute to *N. J. S.* 2A:34-1, stated: "I deem it to be my duty not to annul a marriage,

when that result may be avoided, and thus place upon the innocent child the stigma of bastardy, save as it may be made legitimate by legislative *fiat*." But these remarks of the learned Chancellor were addressed to a situation where there was a ceremonial marriage which was voidable and not absolutely void. The ceremonial marriage here questioned is "absolutely void" by the mandatory command of the statute, *N. J. S. A.* 37:1–10, but the children of a ceremonial marriage we have held to be legitimate pursuant to *R. S.* 9:15–2. The *Caruso* case, therefore, is not in point.

The judgment is affirmed. No costs.

WACHENFELD, JACOBS and BRENNAN, JJ., concurring in result.

*For affirmance*—Chief Justice VANDERBILT, and Justices HEHER, OLIPHANT, WACHENFELD, BURLING, JACOBS and BRENNAN—7.

*For reversal*—None.